[No. A124613. First Dist., Div. One. Dec. 20, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
KOREY HOLLINQUEST, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. and IV. of the Discussion.

1538

**COUNSEL**

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Gregg E. Zywicke and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DONDERO, J.**—Defendant Korey Hollinquest was convicted following a jury trial of first degree murder (Pen. Code, § 187) with a special circumstance (Pen. Code, § 190.2, subd. (a)(17)), and robbery (Pen. Code, § 211). He was sentenced to a term of life in state prison without the possibility of parole.

In this appeal he claims that the admission of the preliminary hearing testimony of a prosecution witness following the prosecutor's refusal to grant the witness immunity at trial constituted prosecutorial misconduct and resulted in a denial of his rights to confrontation and due process. He argues that the prosecutor committed additional acts of misconduct by relying on inadmissible evidence of his silence to prove guilt in violation of his privilege against self-incrimination. He also objects to the trial court's instruction on unjoined perpetrators.

We conclude that the prosecutor did not deny defendant the right of confrontation by refusing to grant immunity to a witness who testified at the preliminary hearing but was subsequently charged with murder. We conclude that the prosecutor's reference in closing argument to defendant's postarrest

silence in discussions with a friend was misconduct, but was not prejudicial to the defense. We find that no other prosecutorial misconduct was committed, and defendant's trial counsel did not afford him inadequate representation. No instructional error occurred. We therefore affirm the judgment.

## STATEMENT OF FACTS

The victim, Jacque Smith, was killed around 1:00 p.m. on August 22, 2005, at 12th Street and Maine Avenue in the Coronado Santa Fe area of Richmond. He suffered eight gunshot wounds, along with multiple fractures and abrasions "all over his body." His injuries were consistent with "being run over" and "dragged along" the pavement by a car, shot, and "pistol-whipped."

The primary testimony that implicated defendant in the murder of Smith came from Torry Buchanan, who, according to at least one account, had been involved for months in an intimate relationship with the victim. Shira Dennis, a close friend of the victim, testified that Smith was openly bisexual, but Buchanan was not, and "didn't want anybody to know" of his sexual relationship with the victim. According to Dennis, Smith and Buchanan lived together briefly in an apartment in Benicia, and acted as "boyfriend and boyfriend."

Not long before the murder, however, Smith became "upset" with Buchanan and did not trust him after his money and some items, including a television, were appropriated and "taken out of the house." Dennis testified that Smith was "tired of Buchanan stealing from him," and was in the process of breaking off their relationship. Smith recently moved to Stockton, and Dennis believed that he did not want Buchanan to know the location of his new residence. Smith was also fearful of Buchanan. Before the murder Smith received a message from someone who warned him Buchanan intended to rob and kill him.

At defendant's preliminary hearing, Buchanan testified after receiving use immunity from the prosecution. This testimony was later presented at defendant's trial. In Buchanan's preliminary hearing testimony, he denied that he had sexual relations with Smith. In fact, Buchanan acknowledged that he warned the victim he would "beat his ass" if Smith "kept telling people" they had a "homosexual relationship." Buchanan testified that he maintained a friendship with Smith to "play him" and "get as much" as he could from the victim. According to Buchanan, Smith bought him clothes and gave him money, and on one occasion provided him with bail in the amount of $45,000 to obtain his release from jail. Smith subsequently threatened to rescind the bond he had posted, which caused Buchanan concern that his bail would be

revoked. Buchanan further acknowledged that shortly before Smith's death, the decedent accused Buchanan of "stealing money from him." Buchanan denied that he stole money from Smith, but Smith no longer trusted him.

Buchanan testified that two days before the murder occurred, defendant, whom he had known for a couple of years, approached him with a plan to rob Smith. Defendant said he "needed some money" and "wanted to rob" Smith, who he knew would be in Buchanan's company. Buchanan said "all right," and they exchanged cell phone numbers to remain in contact to set up the robbery.

About 9:00 on the morning of the murder, Smith drove his navy blue Cadillac to pick up Buchanan in Rodeo. After they stopped for food in Hercules, Buchanan began to drive. He drove the car to Oakland where they "purchased some weed." Buchanan used Smith's cell phone to call defendant to report to him that they were on the way to 12th Street in Richmond. During one call defendant told Buchanan that he had a gun.[1] Buchanan ultimately drove the victim's Cadillac to Richmond, where he parked as arranged with defendant at 12th Street and Florida Avenue.

Defendant approached the car with a gun in his hand and ordered Buchanan to drive around the corner to 13th Street and Maine Avenue. Buchanan did so, and parked the car in a lot near the residence of his friend Brenda. Defendant then struck Smith several times with his fist. Buchanan told Smith to call his mother to arrange for her to give him some money so defendant "wouldn't harm" him. Buchanan heard Smith, on the phone with his mother exclaim, " 'Torry trying to rob me.' " Buchanan yelled to defendant not to kill Smith. After defendant struck Smith, the victim jumped from the car with the cell phone in his hand and "started running" away. Defendant chased after Smith as Buchanan left the car and went to Brenda's house.

From inside Brenda's house Buchanan heard the sound of five or six gunshots coming from Marina Way. He asked Brenda to "see what happened." She went outside for about five minutes, then returned to the house and said that "somebody got killed outside." Buchanan went back outside and observed defendant as he was walking "back towards the car." He threw defendant the keys to the Cadillac, then returned to Brenda's house to ask her to call a cab for him.

Buchanan insisted that he did not want Smith killed, although he admitted that he willingly participated in the robbery. He also testified that defendant

---

[1] Buchanan testified that he and defendant had not discussed a gun when they planned the robbery.

did not mention to him that he planned to kill Smith. Buchanan did not realize that defendant intended to kill Smith until the victim ran from the car and defendant chased after him.

When questioned after the murder, Buchanan lied to the police and claimed that he also had been a victim of the robbery of Smith. Buchanan identified defendant from a photo lineup as the man who robbed and killed Smith. He referred to defendant by the "moniker of Twin or Twig."

After Buchanan spoke with the police, he talked to defendant on the telephone. Defendant asked "why the police came to his house." Buchanan replied that he had been questioned by the police. Defendant said that he "was going to surrender himself to the police."

Buchanan acknowledged that he lied in his interviews with the police to protect himself, but claimed that his preliminary hearing testimony was truthful. Before the preliminary hearing, Buchanan was subpoenaed to testify by an investigator for the district attorney's office. Buchanan expressed to the investigator that he "was afraid," and at his request was placed in a hotel room for his safety. He briefly absconded to Nevada, but voluntarily agreed to return to testify.

Buchanan was not charged with any crimes related to the murder of Smith before the preliminary hearing, and insisted that he has never been "promised anything" in exchange for his testimony. After the preliminary hearing but before defendant's trial, Buchanan was charged with felony murder.

Smith's mother, Joanne Fountaine, corroborated some of Buchanan's testimony. She was aware that her son was acquainted with Buchanan. Fountaine had heard Buchanan's voice over the telephone, and seen his photograph when a bail bondsman visited her house "looking for him." The day before the murder, she also heard Smith tell Buchanan, " 'You better give me my money. I want my money.' "

On the day of the murder, Fountaine loaned Smith her cell phone. Around 1:00 p.m., Smith called her on the cell phone, crying, and "said, 'Momma, they killing me and beating me.' " She heard an unidentified voice, not Buchanan's, order Smith to have his mother bring money. The same voice, which Fountaine identified only as "Black" and "young," said, " 'I'm gonna kill your ass,' " and " 'I'm gonna kill this motherfucker.' " She also recognized Buchanan's voice exclaim, " 'Korey, don't kill him' " a couple of times, before the other man yelled, " 'This guy's gonna run.' " Fountaine was "positive" that *Buchanan* used the name "Korey" to refer to the man beating the victim, although in an interview with an investigator she stated that she

heard *Smith* mention the name "Torry" on the phone. Fountaine then heard "a lot of rattling" sounds, like Smith "was trying to run away," before the phone was thrown or dropped.

Fountaine immediately called the police, then "went looking" for Smith's blue Cadillac. She found her son's car near a school at the corner of 9th Street and Maine Avenue. The car had "blood all over the driver's side" and on the wheels.

Smith's body was located on the curb at the corner of 13th Street and Maine Avenue. "Lots of blood" was found nearby, and "a tire track" was detected across the body, as though Smith had been run over by a vehicle. The "blood-stained tread marks" on the asphalt where Smith's body was found were consistent with the pattern of the Cadillac tires. Expended .44-caliber shell casings were discovered close to the victim and in his clothing. Numerous fingerprints were taken from the Cadillac, but none belonging to defendant were identified.

Witnesses who were present near the scene of the murder heard or observed some of the incident, but none of them identified any of the principals. Juan Trujillo, Wanda Parker, and Crystal DeVaughn were in a house on 13th Street and Maine Avenue the day of the murder.[2] They heard screaming outside that sounded like a frightened woman pleading "stop" or "let me go," and a "male voice" that sounded angry. A few seconds later a Black person with "dreads" was chased by another, heavier Black person, then numerous gunshots fired in quick succession were heard. The "person who had the dreads" was then seen lying in the street, twitching, before a blue Cadillac ran over his body and "kept going." Trujillo also told the police that he observed a "Black male," around "5 foot 9," walk along Maine Avenue and toss car keys to another person.

Raymonde Magnier, who lived on the corner of 13th Street and Maine Avenue, heard shots outside her house. She looked through a window and observed "something down on the ground," which was "covered up," and a man walking past her house with a "gun in his hand." He was a "Black man," about five feet 10 inches tall, medium build, around 25 years old, wearing dark clothes. She did not identify defendant as the man with the gun.

Robert Jones, a landscape contractor "working at 15th and Florida that day," observed the shooting from three blocks away. He described the shooter as Black, 18 to 20 years old, with hair that was perhaps two and a half inches

---

[2] Trujillo testified at the preliminary hearing, but was unavailable at trial. His preliminary hearing testimony was read into the record at trial.

long and may have been braided, wearing a hooded sweatshirt. The shooter was standing with his arm extended, about five feet from the victim, who was sitting on the ground. The shooter was angry and walked around in a circle after he repeatedly shot the victim.

Brenda Murry lived at her grandmother's apartment on Marina Way near 13th Street and Maine Avenue when the shooting occurred. Buchanan was a family friend who came to the back door of Murry's residence on the day of the shooting, and mentioned that he was meeting her cousin there.[3] About two or three minutes later, gunshots were fired nearby, followed by police cars "flying down the street." Murry walked outside a minute or two later. Buchanan asked to use her phone and stayed in the apartment. Murry was only outside for "a couple of seconds" before she returned to the apartment. Buchanan was still inside, on the phone. Buchanan made a total of 23 calls on Murry's cell phone between 1:03 and 1:24 p.m., the last one to a taxicab company. He then left the apartment.

Considerable evidence of cell phone use on the day of the shooting was presented, much of it from Philip Venable, a "high tech investigator" with the Contra Costa County Sheriff's Office, who qualified as an expert in cell phone records and call origins. Venable analyzed the records of calls made and received on the day of the murder for cell phones that belonged to defendant, the victim—who had Joanne Fountaine's phone the day of the murder—and Brenda Murry—whose phone was used by Buchanan. Multiple calls between Buchanan, using Fountaine's phone in the victim's possession, and defendant, initiated from both parties, began at 11:52 a.m., with a call from Buchanan in Oakland to defendant in Richmond, followed by a call from defendant to Buchanan one minute later. The calls between the two phones continued thereafter, and culminated in a call from Buchanan to defendant at 12:56 p.m., just before the murder occurred, during which a voice mail message was left. Some of the calls did not go through, others resulted in conversations or voice mail messages that lasted up to nearly three minutes. As time passed, the locations of the two phones, as revealed by the cell sites or towers where the calls originated, grew increasingly close, until the last call was registered "at the same cell site" on Harbour Way in Richmond, which indicated that the two phones were then in very close proximity to each other and to the scene of the murder. At 12:59 p.m., the victim's phone called Fountaine's home phone from the same cell site for a duration of just over one minute. Thereafter, no calls were registered between defendant's phone and the victim's phone.

Of the numerous calls made by Buchanan on Murry's phone immediately following the murder, seven attempted calls of two seconds or less in duration

---

[3] Murry's cousin never appeared at the apartment that day.

were made to defendant's phone between 1:03 and 1:20 p.m. A connected call of very brief duration was made from defendant's phone to Murry's phone at 1:26 p.m. A total of 85 calls were made to the victim's cell phone after the murder from nearby cell phone sites, but none were answered.

Testimony was also received from witnesses who were with defendant on the day of the murder. His girlfriend, Jessica Stitts, recalled that defendant was "very withdrawn" that day due to the death of a friend. Stitts drove defendant in her car to Fairfield, then to the south side of Richmond. Defendant directed her to drive to 9th Street in Richmond, near the location where the victim's vehicle was found. She stopped the car, whereupon defendant got out of her car and "into another car" that "never moved," and talked to a friend. Stitts testified that defendant was out of her car for 10 to 15 minutes, although she "wasn't even paying attention." He then returned and they drove back to Fairfield.

Maritza Vande Voorde, a counselor at Contra Costa College, testified that defendant had a counseling appointment with her around 2:00 p.m. the day of the murder. He missed the appointment, so Voorde called defendant, and he subsequently returned her call. Defendant sounded "upset," and mentioned that a "friend of his was shot and killed" the day before.

Don Heidary was "very close" with defendant and his twin brother Karey since they were five years old. He regarded his relationship with defendant as similar to a godparent or uncle. In the days after the murder, Heidary learned that the police were looking for defendant in connection with the crime. Defendant said he had "nothing to hide," so Heidary advised him to "go to the police." Heidary and defendant's brother Karey then facilitated defendant's "surrender" to the police on the afternoon of August 25, 2005.[4] Defendant did not say anything to Heidary about the murder of Smith.

Heidary also testified that in numerous recorded telephone conversations during defendant's incarceration, they discussed some of the details of the case—particularly the nature of the evidence, the prosecution's witnesses, and defendant's relationship with Buchanan—but defendant did not refer to the murder or the calls that came to his cell phone from Buchanan. Investigator Daryl Jackson, an investigating officer in the case, interviewed Heidary and reviewed the numerous recorded phone conversations between him and defendant that took place following defendant's arrest. Heidary disclosed to Jackson that defendant "never told him of any relationship" with Buchanan, and did not give "an explanation" for the cell phone contacts with him on the day of the murder.

---

[4] Defendant was the subject of an arrest warrant for murder at the time, although no evidence was presented that he was aware of the warrant.

Paul Gaines considered the victim his "cousin," and was close to him. After the murder of Smith, Gaines was briefly incarcerated for a domestic violence charge that was subsequently dismissed. While he was in jail, he was in the same module with defendant and they were often in contact. On one occasion, in the context of a discussion of the consequences of crimes and incarceration, defendant stated, "I wish I never did what I did to be in here," and expressed that he was sorry. Defendant also mentioned that he "always kept" a handgun with him in his neighborhood, and had chased someone down in a park with his gun. While Gaines was incarcerated, he was not aware that defendant was associated with Smith's murder. When Gaines told defendant and other inmates the story of Smith's murder, however, and mentioned his name, defendant got a strange look on his face and thereafter no longer had any contact with Gaines during their joint incarceration. Gaines learned that defendant was accused of Smith's murder only after he was released. He then told his cousin Shira Dennis that "he was in custody with the guy" who killed Smith.

## DISCUSSION

I. *The Admission of Torry Buchanan's Preliminary Hearing Testimony.*

Defendant argues that the trial court abridged his confrontation rights by admitting Buchanan's preliminary hearing testimony at trial. After Buchanan gave his testimony at the preliminary hearing, the prosecution decided to charge him with the robbery and murder of Smith. The use immunity granted to Buchanan at the preliminary hearing was withdrawn, and he asserted his Fifth Amendment privilege not to testify at trial. Over objection by the defense, the trial court then found that Buchanan was an unavailable witness and admitted his preliminary hearing testimony, which was read to the jury. Defendant complains that the procedure whereby the prosecution granted a witness and codefendant use immunity to procure preliminary hearing testimony, then revoked the immunity to make the witness unavailable at trial, denied him the "right to cross-examine his co-defendant before his jury."

■ We begin our analysis with recognition of an unassailable constitutional premise: " '[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 538 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) The "right of confrontation is not absolute, however [citations], 'and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' [Citation.]" (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121,

1138–1139 [99 Cal.Rptr.2d 149, 5 P.3d 203]; see also *People v. Stritzinger* (1983) 34 Cal.3d 505, 515 [194 Cal.Rptr. 431, 668 P.2d 738]; *People v. Harris* (1985) 165 Cal.App.3d 1246, 1257 [212 Cal.Rptr. 216].) In particular, the right of confrontation "does not preclude the prosecution from proving its case through the prior testimony of a witness who is unavailable at trial, so long as the defendant had the right and the opportunity to cross-examine the witness during the earlier proceeding at which the witness gave this testimony." (*People v. Cudjo* (1993) 6 Cal.4th 585, 618 [25 Cal.Rptr.2d 390, 863 P.2d 635].) " 'If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial.' [Citations.]" (*People v. Seijas* (2005) 36 Cal.4th 291, 303 [30 Cal.Rptr.3d 493, 114 P.3d 742].)

■ Also indisputable is the principle that a witness, upon proper assertion of the privilege against self-incrimination, is unavailable as a witness at trial. (*People v. Duarte* (2000) 24 Cal.4th 603, 609–610 [101 Cal.Rptr.2d 701, 12 P.3d 1110].) "Evidence Code section 240, subdivision (a) defines unavailable witnesses as any of five types of witnesses. A witness who is exempted from testifying on the ground of privilege is defined as one type."[5] (*People v. Williams* (2008) 43 Cal.4th 584, 625 [75 Cal.Rptr.3d 691, 181 P.3d 1035].) "A witness who successfully asserts the privilege against self-incrimination is unavailable to testify for these purposes." (*People v. Seijas, supra*, 36 Cal.4th 291, 303.) Here, Buchanan successfully asserted the privilege at trial. The fact that he did not assert the privilege at the preliminary hearing did not foreclose him from doing so at trial. (*Id.* at p. 303; *People v. Malone* (1988) 47 Cal.3d 1, 23 [252 Cal.Rptr. 525, 762 P.2d 1249].)

We recognize that " '[t]o be found unavailable on this ground, a witness must not only intend to assert the privilege, but also be entitled to assert it.' [Citation.]" (*People v. Seijas, supra*, 36 Cal.4th 291, 303.) The witness in the case before us had been charged with murder before trial, and his use immunity had been revoked by the prosecutor. The trial court correctly concluded that Buchanan "reasonably apprehended danger if he testified." (*Id.* at p. 306.) Also indisputable is that Buchanan asserted he would refuse to

---

[5] Evidence Code section 240, subdivision (a) provides in full: "(a) Except as otherwise provided in subdivision (b), 'unavailable as a witness' means that the declarant is any of the following: [¶] (1) Exempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant. [¶] (2) Disqualified from testifying to the matter. [¶] (3) Dead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity. [¶] (4) Absent from the hearing and the court is unable to compel his or her attendance by its process. [¶] (5) Absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

testify as to any matter to which he had testified at the preliminary examination. (*People v. Farmer* (1983) 145 Cal.App.3d 948, 951 [193 Cal.Rptr. 788].) We find, as did the trial court, that Buchanan was entitled to assert the privilege, and defendant does not suggest otherwise.

More difficult issues related to admissibility of Buchanan's preliminary hearing testimony remain: whether defendant had an adequate opportunity to cross-examine Buchanan at the preliminary hearing; and whether the prosecutor acted improperly by procuring the unavailability of the witness. The facts pertinent to the witness's assertion of the privilege are essentially undisputed, so we independently review the trial court's ruling that declared the witness unavailable. (*People v. Seijas, supra*, 36 Cal.4th 291, 303.)

A. *Defendant's Opportunity to Cross-examine the Witness.*

█ Defendant objects that he was not given an "adequate opportunity to cross-examine" Buchanan at the preliminary hearing. Under the recognized exception to the rule that a criminal defendant has the right to confront the witnesses against him (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15), the testimonial statements of witnesses absent from trial may be " 'admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.' [Citations.] Evidence Code section 1291 codifies this traditional exception. [Citation.] When the requirements of Evidence Code section 1291 are met, 'admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]' [Citation.] [¶] Evidence Code section 1291, subdivision (a)(2), provides that former testimony is not rendered inadmissible as hearsay if the declarant is 'unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 340–341 [30 Cal.Rptr.3d 513, 114 P.3d 758]; see also *People v. Gonzales* (2005) 131 Cal.App.4th 767, 774 [32 Cal.Rptr.3d 172].)

█ "The recent decision of *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], although changing the law of confrontation in some respects, left these principles intact." (*People v. Seijas, supra*, 36 Cal.4th 291, 303.) " '[A]s long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective.' [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1173–1174 [32

Cal.Rptr.3d 759, 117 P.3d 476]; see also *United States v. Owens* (1988) 484 U.S. 554, 559 [98 L.Ed.2d 951, 108 S.Ct. 838].) "[A] prior opportunity to cross-examine a witness who has become unavailable is considered an adequate substitute for present cross-examination at trial." (*People v. Jones* (1998) 66 Cal.App.4th 760, 766 [78 Cal.Rptr.2d 265].)

"Under these rules," the California Supreme Court has " 'routinely allowed admission of the preliminary hearing testimony of an unavailable witness.' [Citation.]" (*People v. Seijas, supra*, 36 Cal.4th 291, 303.) Here, the preliminary hearing and trial proceedings were of the "same type, i.e., criminal, the trial strategy (discredit the witness and claim innocence) was the same; the potential penalty (incarceration) was the same; and the issue and parties were the same." (*People v. Gonzales, supra*, 131 Cal.App.4th 767, 775; see also *People v. Samayoa* (1997) 15 Cal.4th 795, 850–851 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Our review of Buchanan's preliminary hearing testimony also reveals that defense counsel undertook a thorough and effective cross-examination of the witness. Buchanan's numerous prior fabrications, his motives to falsify, and his own potential culpability for the murder, were comprehensively explored at the preliminary hearing.

Defendant nevertheless complains that several factors demonstrate the inadequacy of his opportunity to cross-examine Buchanan at the preliminary hearing. First, he points out that the cell phone records so consequential to the prosecution's effort to substantiate Buchanan's version of the murder were not available to the defense until after the preliminary hearing. He maintains that without prior discovery of the cell phone records his counsel "was unable to investigate them before the preliminary examination," and therefore could not properly cross-examine Buchanan on a matter "which constituted almost the sole arguable corroboration of Buchanan's testimony."

We are not convinced that the cross-examination of Buchanan by the defense at the preliminary hearing was compromised by the lack of prior access to cell phone records. " '[A] defendant's interest and motive at a second proceeding is not dissimilar to his interest at a first proceeding within the meaning of Evidence Code section 1291, subdivision (a)(2), simply because events occurring after the first proceeding might have led counsel to alter the nature and scope of cross-examination of the witness in certain particulars.' [Citation.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 293–294 [74 Cal.Rptr.3d 605, 180 P.3d 351].) At the preliminary hearing the defense was aware that the victim's cell phone was found in the car after the murder, and on cross-examination defense counsel probed Buchanan's testimony that he used the victim's cell phone to contact defendant. Thus, the defense had a reason and at least the opportunity to elicit testimony from Buchanan about the extent of his cell phone conversations with defendant at the preliminary

hearing. We also do not think any cross-examination of Buchanan on the subject of cell phone records by the defense at trial would have resulted in a more successful challenge to the reliability of his testimony.[6] (See *People v. Wilson, supra,* 36 Cal.4th 309, 345–346.) " 'As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity.' [Citation.]" *(People v. Smith* (2003) 30 Cal.4th 581, 611–612 [134 Cal.Rptr.2d 1, 68 P.3d 302].) Further, at trial the defense had the cell phone records, and managed to engage in cross-examination and argument as to their import in the case.

We also disagree with defendant's assertion that cross-examination of the witness at trial was necessary to bring out "whether Buchanan was expecting or being given any benefits in his own case in exchange for his testimony." The defense had the opportunity to cross-examine Buchanan at the preliminary hearing about any advantage he expected to receive from his testimony at that proceeding. When circumstances changed at trial the defense fully explored the matter of any promise of leniency through the cross-examination of officers at trial. By that stage of the proceedings the prosecution elected not to grant Buchanan immunity, and thus had no reason to offer him leniency. Nothing in the record suggests any sort of preexisting arrangement, either explicit or implicit, between Buchanan and the prosecution. Additionally, defendant does not allude to any evidence of favors offered the witness by the government. Cross-examination of Buchanan at trial about his cooperation with law enforcement would not have significantly altered the jury's view of his credibility. (See *People v. Wilson, supra,* 36 Cal.4th 309, 345.)

Nor are we receptive to defendant's claim that "the jury should have been able to observe Buchanan's demeanor" at trial, particularly in light of his fabrications to the police and denial of a "gay relationship" with the victim. Live testimony of a witness, which grants the trier of fact an opportunity to observe demeanor, is always preferable to former testimony, but no more so in the present case just because the witness may have falsely denied complicity in the crime or had some form of intimate relationship with the victim. The preference for face-to-face cross-examination at trial has been found to be outweighed by recognized competing interests that warrant dispensing with the right of confrontation under circumstances where the defense had the opportunity to cross-examine the witness at the previous hearing with an interest and motive similar to that which he has at the subsequent hearing. *(Ohio v. Roberts* (1980) 448 U.S. 56, 63 [65 L.Ed.2d 597, 100 S.Ct. 2531]; *People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1434 [105

---

[6] We also note that in light of the circumstances we can at least speculate that for tactical reasons the defense did not want to engage in questioning Buchanan about the number and content of his phone conversations with defendant before or after the murder.

Cal.Rptr.2d 504].) "[I]t is settled that the preference for live testimony gives way when the witness properly invokes the privilege against self-incrimination and a prior appropriate opportunity for cross-examination existed." (*People v. Williams, supra,* 43 Cal.4th 584, 623; see also *People v. Reed* (1996) 13 Cal.4th 217, 225–226 [52 Cal.Rptr.2d 106, 914 P.2d 184].) The inability of the jury to view Buchanan's demeanor at trial did not negate his status as an unavailable witness.

### B. *The Refusal of the Prosecution to Grant the Witness Immunity.*

We move to defendant's contention that the prosecutor committed misconduct by failing to grant Buchanan immunity at trial, and the trial court therefore erred by finding that he was an unavailable witness. He relies on Evidence Code section 240, subdivision (b), to argue that where the unavailability of a witness is procured by the proponent for the purpose of preventing the witness from testifying, the witness is not unavailable. The definitions of an unavailable witness specified in subdivision (a) of Evidence Code section 240, are expressly subject to an exception "provided in subdivision (b)." Subdivision (b) of Evidence Code section 240 (section 240), provides: "A declarant is not unavailable as a witness if the exemption, preclusion, disqualification, death, inability, or absence of the declarant was brought about by the procurement or wrongdoing of the proponent of his or her statement for the purpose of preventing the declarant from attending or testifying." Defendant claims that the "prosecutor's acts of granting, and then withdrawing, immunity" to Buchanan constituted "wrongdoing" that "procured" the unavailability of the witness. He asserts that the evidence shows the prosecutor "intentionally" withheld immunity from the witness "simply for the purpose of keeping Buchanan unavailable, so he could read Buchanan's former testimony to the jury. This testimony establishes the purpose prong in [section] 240(b), namely, that the prosecutor withdrew the immunity grant in order to prevent Buchanan from testifying" at trial.

■ Our inquiry proceeds from the established premise that neither the prosecution nor the trial court was obligated to confer immunity upon Buchanan at trial. The courts have "recognized that the power to confer immunity is granted by statute to the executive, that is, to the prosecution (see [Pen. Code,] § 1324), and have questioned whether a trial court possesses inherent authority to grant such immunity." (*People v. Stewart* (2004) 33 Cal.4th 425, 468 [15 Cal.Rptr.3d 656, 93 P.3d 271].) In fact, the California Supreme Court has definitively declared: "The grant of immunity is an executive function, and prosecutors are not under a general obligation to provide immunity to witnesses in order to assist a defendant. [Citations.] Similarly, we have expressed reservations concerning claims that trial courts possess inherent authority to grant immunity [citation], and even assuming

the court possesses such authority, it has been recognized only when the defense has made a showing that a *defense* witness should be afforded immunity in order to provide clearly exculpatory testimony." (*People v. Williams, supra*, 43 Cal.4th 584, 622–623.)

■ The federal due process test, which essentially mirrors the California standard delineated in section 240, subdivision (b), also recognizes the " 'exclusive authority and absolute discretion' " vested in the prosecution to grant immunity to a witness, and intrudes upon that discretion only where the prosecution violates the defendant's right to a fair trial by refusing to grant use immunity to a witness whose testimony would have been relevant " 'with the deliberate intention of distorting the fact-finding process.' " (*U.S. v. Straub* (9th Cir. 2008) 538 F.3d 1147, 1156, italics omitted; see also *Williams v. Woodford* (9th Cir. 2004) 384 F.3d 567, 600; *Woods v. Adams* (C.D.Cal. 2009) 631 F.Supp.2d 1261, 1279–1280.) *Intentional* distortion of the factfinding process requires government action that amounts "to something akin to prosecutorial misconduct." (*U.S. v. Straub, supra*, at p. 1157.)

■ We therefore focus on the prosecutor's motives for withholding immunity from Buchanan. In so doing, we do not find that the unavailability of the witness was procured by the prosecutor's misconduct for the wrongful purpose of preventing his testimony at trial. To establish a violation of his confrontation rights through misconduct by the prosecutor that resulted in the deprivation of testimony of a witness, the defendant must establish three elements: first, prosecutorial misconduct that was entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify; second, the prosecutor's misconduct was a substantial cause in depriving the defendant of the witness's testimony; and third, the testimony defendant was unable to present was material to his defense. (*People v. Lucas* (1995) 12 Cal.4th 415, 457 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People v. Woods* (2004) 120 Cal.App.4th 929, 936 [16 Cal.Rptr.3d 174].)

The record before us demonstrates only that the prosecutor elected not to grant Buchanan immunity in the aftermath of his distinctly incriminating testimony at the preliminary hearing. In response to argument by the defense that Buchanan was not unavailable, the prosecutor merely expressed that he was not required to grant the witness immunity and did not intend to do so. Nothing in the record indicates that the prosecutor acted for the improper purpose of intentionally rendering Buchanan an unavailable witness at trial. And in fact, other legitimate reasons are explicable for the prosecutor's decision to decline to extend Buchanan's use immunity to testimony at trial. No charges were pending against Buchanan when he testified at the preliminary hearing, and he had previously given false statements to the police that

did not implicate him in the murder.[7] In light of Buchanan's conflicting versions of the incident and the lack of any testimony from him before the preliminary hearing, a grant of immunity at that point in the proceedings was at least understandable to obtain some testimony from him. Once Buchanan's testimony at the preliminary hearing firmly established his own guilt as well as that of defendant, the prosecutor may have justifiably concluded that the witness was no longer a worthy candidate for a grant of immunity. He was then charged with the robbery and murder before defendant's trial. A reasonable person simply cannot argue that after the testimony at the preliminary hearing, the prosecutor was precluded from charging Buchanan, or, alternatively, awarding him use immunity at trial. Denial of a grant of immunity or leniency to Buchanan in exchange for his testimony at trial was not "wholly unnecessary to the proper performance" of the prosecutor's duties, but rather was an appropriate tactical decision and exercise of executive discretion. (*People v. Woods, supra,* 120 Cal.App.4th 929, 937–938.)

Also, the record here is devoid of any evidence suggesting to us in any way that threats, intimidation or coercion was exerted upon Buchanan by the prosecution that precluded him from making a free and voluntary choice not to testify. (See *Woods v. Adams, supra,* 631 F.Supp.2d 1261, 1281–1282; *Davis v. Straub* (6th Cir. 2005) 430 F.3d 281, 287.) The prosecution did not intentionally distort the factfinding process by taking affirmative steps to prevent Buchanan from testifying or grant immunity to other witnesses while denying immunity to him.[8] (*U.S. v. Whitehead* (9th Cir. 2000) 200 F.3d 634, 640, cert. den. *sub nom. Whitehead v. United States* (2000) 531 U.S. 885 [148 L.Ed.2d 141, 121 S.Ct. 202].)

■ In the absence of any evidence before us of the prosecutor's improper motive or other misconduct that resulted in Buchanan's assertion of his privilege against self-incrimination, we cannot conclude that the prosecutor acted with the specific objective of preventing the witness from testifying within the meaning of section 240, subdivision (b). Nor did the admission of Buchanan's prior testimony violate defendant's rights to confrontation and due process. (*People v. Woods, supra,* 120 Cal.App.4th 929, 938–939.) Therefore, Buchanan was an unavailable witness and his preliminary hearing testimony was properly admitted at trial without any statutory or constitutional violation. (See *People v. Smith, supra,* 30 Cal.4th 581, 612.)

---

[7] We realize that Buchanan also made a statement just before the preliminary hearing that incriminated him in the murder. However, he was not charged before his preliminary hearing testimony was given.

[8] The failure of the prosecution to continue the trial to resolve the charges against Buchanan was not in our view an affirmative step to prevent him from testifying.

II. *The Admission of Evidence That Defendant Failed to Explain the Telephone Contacts with Buchanan.*

Defendant also argues that evidence of his "post-arrest silence" was admitted without objection by his counsel. (*Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] (*Doyle*).) The evidence challenged by defendant is testimony from investigator Daryl Jackson, who interviewed Don Heidary. Jackson also listened to the more than 100 recorded telephone conversations between defendant and Heidary after defendant was arrested. Jackson testified that he discussed with Heidary the incriminating cell phone records of calls between defendant and Buchanan. Heidary stated to Jackson that defendant "never had an explanation" for the cell phone contacts with Buchanan on the day of the murder, and "never told him of any relationship" with Buchanan. Jackson asked Heidary about defendant's relationship and phone contacts with Buchanan to determine if he "had an innocent explanation for some of the facts in this case," but defendant "never gave [Heidary] that information."[9] Defendant claims that the inquiry into his postarrest silence was improper, and his attorney provided ineffective assistance by failing to object to investigator Jackson's testimony.

▪ Defendant forfeited any challenge to the admission of the evidence by failing to object at trial, so we proceed to his claim of ineffective assistance of counsel. (*People v. Huggins* (2006) 38 Cal.4th 175, 198 [41 Cal.Rptr.3d 593, 131 P.3d 995]; *People v. Hughes* (2002) 27 Cal.4th 287, 332 [116 Cal.Rptr.2d 401, 39 P.3d 432].) "The standards for ineffective assistance of counsel claims are well established. 'We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions.' [Citation.] To establish a meritorious claim of ineffective assistance, defendant 'must establish either: (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations] or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. [Citations.]' [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 261 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; see

---

[9] Heidary similarly testified that defendant told him Buchanan was perhaps a "distant relative," but "that there wasn't a close relationship" between the two of them. In conversations with Heidary, defendant also did not mention any cell phone conversations with Buchanan. Heidary testified that he did not "remember specifically" any conversation with defendant in which he explained the use of his cell phone on the day of the murder, or provided a reason for calling the victim's cell phone. According to Heidary, he and defendant never discussed "any facts" related to the day of the murder. No objection to Heidary's testimony was made by the defense.

also *People v. Frye* (1998) 18 Cal.4th 894, 979 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215 [66 Cal.Rptr.2d 123, 940 P.2d 710]; see also *In re Jones* (1996) 13 Cal.4th 552, 561 [54 Cal.Rptr.2d 52, 917 P.2d 1175].) Further, " 'When . . . the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons. . . . Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, not on appeal.' [Citation.]" (*People v. Lucero* (2000) 23 Cal.4th 692, 728–729 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

Counsel's performance must be evaluated by determining whether the testimony elicited by the prosecutor from investigator Jackson violated the principles in *Doyle*. "Defense counsel's performance cannot be considered deficient if there was no error to object to." (*People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1520 [275 Cal.Rptr. 810] (*Eshelman*).)

 "In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda*[10] warnings to impeach the defendant's trial testimony. (*Doyle, supra*, 426 U.S. at pp. 617–618.)" (*People v. Collins* (2010) 49 Cal.4th 175, 203 [110 Cal.Rptr.3d 384, 232 P.3d 32]; see also *People v. Earp* (1999) 20 Cal.4th 826, 856 [85 Cal.Rptr.2d 857, 978 P.2d 15].) " 'Post-arrest silence also may not be used against a defendant at trial in order to imply guilt from that silence.' " (*Stone v. U.S.* (6th Cir. 2007) 258 Fed.Appx. 784, 787.) "The Supreme Court has explained the rationale of this holding in these terms: '[The] use of silence for impeachment [is] fundamentally unfair . . . because "*Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances." ' [Citation.]" (*People v. Evans* (1994) 25 Cal.App.4th 358, 367 [31 Cal.Rptr.2d 20]; see also *People v. Hurd* (1998) 62 Cal.App.4th 1084, 1092 [73 Cal.Rptr.2d 203].)

"The prosecutor cannot use the defendant's invocation of his right to remain silent or refusal to answer questions as evidence against him. [Citations.] Particularly, the defendant's silence may not be used to impeach his credibility. [Citations.] [¶] To establish a violation of due process under *Doyle*, the defendant must show that the prosecution inappropriately used his postarrest silence for impeachment purposes and the trial court permitted the prosecution to engage in such inquiry or argument." (*People v. Champion*

---

[10] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed. 694, 86 S.Ct. 1602] (*Miranda*).

(2005) 134 Cal.App.4th 1440, 1448 [37 Cal.Rptr.3d 122].) "To assess whether these questions constitute *Doyle* error, we ask whether the prosecutor referred to the defendant's post-arrest silence so that the jury would draw 'inferences of guilt from [the] defendant's decision to remain silent after . . . arrest.' [Citation.]" (*Smith v. Jones* (6th Cir. 2009) 326 Fed.Appx. 324, 330.)

 The Attorney General argues that the *Doyle* rule does not compel "suppression of statements to *private parties* not involved in official interrogation." (Italics added.) The mere fact that defendant's silence was exhibited to a private party rather than in response to police questioning does not necessarily preclude a constitutional violation. "[E]ven outside the context of custodial interrogations, silence remains constitutionally protected if it appears to be an assertion of the right to remain silent." (*People v. Jennings* (2003) 112 Cal.App.4th 459, 473, fn. 2 [5 Cal.Rptr.3d 243].) Rather, we must examine "the circumstances surrounding defendant's post-*Miranda* silence. *Doyle* need not apply to defendant's silence invoked by a private party absent a showing that such conduct was an assertion of his rights to silence and counsel. [Citation.] On the other hand, when the evidence demonstrates that defendant's silence in front of a private party results primarily from the conscious exercise of his constitutional rights, then *Doyle* should apply." (*Eshelman, supra,* 225 Cal.App.3d 1513, 1520; see also *People v. Delgado* (1992) 10 Cal.App.4th 1837, 1842, fn. 2 [13 Cal.Rptr.2d 703].)

The distinction is demonstrated by two cases. In *Eshelman, supra,* 225 Cal.App.3d 1513, 1520, after the defendant was released on bail he refused to respond to his girlfriend's questions, in part expressly because his attorney told him not to speak to the witness before the trial. The court concluded that the defendant's silence exhibited his "reliance on his constitutional rights to silence and counsel," and thus *Doyle* error occurred. (*Eshelman, supra,* at p. 1521.) Importantly, the defendant in *Eshelman* expressly advised his girlfriend that he could not discuss the case based on legal advice.

In contrast, in *People v. Medina* (1990) 51 Cal.3d 870, 889 [274 Cal.Rptr. 849, 799 P.2d 1282], not long "after defendant's arrest, his sister . . . visited him in jail," and asked, " 'why did you have to shoot those three poor boys?' Defendant initially made no response," but "later indicated he did not wish to talk about the matter." The "record fail[ed] to show that defendant was given *Miranda* warnings prior to his conversation with his sister." (*Id.* at p. 890.) The court concluded that "in the context of the present case, where defendant was engaged in conversation with his own sister, it was not unreasonable to permit the jury to draw an adverse inference from his silence in response to her inquiry as to why he shot the victims. [¶] The record does not suggest that defendant believed his conversation with his sister was being monitored, or that his silence was intended as an invocation of any constitutional right."

(*Ibid.*) The court added: "We are not here concerned with, and do not address, the situation in which an in-custody, *Mirandized*, suspect is confronted with an accusatory statement in circumstances where he may be presumed to suspect the monitoring of his conversation." (*Id.* at p. 891.)

Without an objection by defense counsel to the admission of investigator Jackson's testimony, the record in the present case is a bit ambiguous. In contrast to *Eshelman*, no evidence was adduced that directly reflects upon defendant's motivation for declining to discuss the case with Heidary. Nothing indicates that in his conversations with Heidary defendant expressed his intent to invoke his constitutional rights, as did the defendant in *Eshelman*. Heidary and investigator Jackson both merely testified that defendant did not mention any facts related to the case, and specifically did not offer any explanation of his relationship or cell phone contacts with Buchanan. Apparently, these were not topics of conversation. However, the perspective of the conversations suggests that defendant may have at least been aware of his right to silence. He was speaking with Heidary while he was incarcerated, and during their conversations institutional warnings were repeated that "everything you say here is being recorded." Although Heidary could not recall if defendant's attorney advised him "never to discuss the facts" of the murder, he acknowledged "that very well could have happened" because he had not "done that." While defendant did not adduce explicit evidence that his silence was induced by his counsel's advice, as did the defendant in *Eshelman*, the context of defendant's recorded phone conversations with Heidary are indicative of an exercise of his constitutional rights to silence and counsel.

Assuming that defendant's failure to discuss the facts of the case with Heidary was an assertion of his right to remain silent, we must determine if *Doyle* error was committed. "An assessment of whether the prosecutor made inappropriate use of defendant's postarrest silence requires consideration of the context of the prosecutor's inquiry or argument." (*People v. Champion, supra*, 134 Cal.App.4th 1440, 1448.) Defendant did not make any statements to the police or testify at trial, so investigator Jackson's testimony was not offered for impeachment purposes. "But the principles of *Doyle* apply even if a defendant does not take the stand in his own defense thereby subjecting himself to potential impeachment. A defendant is entitled to rely on the assurance when he is '*Miranda*-ized' that his silence will not be used against him. The *Miranda* warnings are deemed to have induced the silence." (*U.S. v. Fambro* (5th Cir. 2008) 526 F.3d 836, 841, fns. omitted.) The United States Supreme Court has " 'consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him.' *Fletcher v. Weir*, 455 U. S. 603, 606 [71 L.Ed.2d 490, 102 S.Ct. 1309] (1982) *(per curiam)*. The *Miranda* warnings had, after all, specifically given the defendant both the

option of speaking and the option of remaining silent—and had then gone on to say that if he chose the former option what he said could be used against him. It is possible to believe that this contained an implicit promise that his choice of the option of silence would *not* be used against him." (*Portuondo v. Agard* (2000) 529 U.S. 61, 74–75 [146 L.Ed.2d 47, 120 S.Ct. 1119].)

The evidence of defendant's silence during conversations with his friend Heidary was offered to demonstrate that defendant did not discuss an innocent explanation for the incriminating evidence of the cell phone records—or, for that matter, any other facts related to the case—under circumstances in which he may have been expected to do so. During closing argument, the prosecutor mentioned that defendant's discussions of the case with Heidary, particularly "when the preliminary hearing was going on," presented him the "opportunity to explain the evidence" to his "dear friend." The prosecutor then argued that if the jury found defendant's "[s]ilence in the face of that" indicated a "consciousness of guilt," "it's something you can consider." The prosecutor added: "In the face of an accusation, silence or lies or feigned unawareness can show a consciousness of guilt, [as] it does in this case." Also, investigator Jackson's testimony was not presented in an effort to rebut other statements made by defendant or any claim that he was not given the opportunity to explain his failure to discuss the matter. (Cf. *U.S. v. Ross* (9th Cir. 2005) 149 Fed.Appx. 670, 673; *Hall v. Scribner* (N.D.Cal. 2008) 619 F.Supp.2d 823, 844; *People v. Champion, supra*, 134 Cal.App.4th 1440, 1451–1452.) Rather, with the investigator's testimony the prosecutor on his own initiative urged the jury to draw an adverse inference of guilt from defendant's postarrest silence.[11] By drawing attention to the fact that defendant never explained the phone calls to Buchanan or mentioned the other facts of the case to Heidary, the prosecutor violated the precepts of *Doyle*. (See *U.S. v. Whitehead, supra*, 200 F.3d 634, 639; *U.S. v. Lopez* (9th Cir. 2007) 500 F.3d 840, 845.)

We turn our focus to an examination of the prejudicial impact of the admission of evidence in violation of *Doyle*, and the prosecutor's associated misconduct by arguing that defendant's silence exhibited consciousness of guilt. The test of prejudice is the standard enunciated in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]: we must reverse the judgment unless beyond a reasonable doubt the error complained of did not contribute to the verdict. (*U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1163; *People v. Waldie* (2009) 173 Cal.App.4th 358, 366 [92 Cal.Rptr.3d 688]

---

[11] In *United States v. Robinson* (1988) 485 U.S. 25, 32 [99 L.Ed.2d 23, 108 S.Ct. 864], the United States Supreme Court explained: "Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, . . . the privilege against compulsory self-incrimination is violated. But where . . . the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege."

(*Waldie*); *People v. Champion, supra*, 134 Cal.App.4th 1440, 1453.) " 'When deciding whether a prosecutor's reference to a defendant's post-arrest silence was prejudicial, this court will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt.' [Citation.]" (*U.S. v. Lopez, supra*, 500 F.3d 840, 845.)

Testimony and argument that defendant did not mention the facts of the case to Heidary had negligible probative value at best. The admission of investigator Jackson's testimony that briefly recounted his interviews with Heidary was even less significant, as it was merely cumulative to the much more comprehensive testimony on the same subject by Heidary.[12] The United States Supreme Court has observed that "In most circumstances silence is so ambiguous that it is of little probative force." (*United States v. Hale* (1975) 422 U.S. 171, 176 [45 L.Ed.2d 99, 95 S.Ct. 2133]; see also *Doyle, supra*, 426 U.S. 610, 617 [silence is often "insolubly ambiguous"].) "[T]here may be several explanations for the silence that are consistent with an exculpatory explanation or the silence may be nothing more than the arrestee's exercise of his or her *Miranda* rights . . . ." (*People v. Sutton* (1993) 19 Cal.App.4th 795, 799–800 [23 Cal.Rptr.2d 632].) In the present case, investigator Jackson's testimony was especially vague and unpersuasive as a form of adoptive admission or consciousness of guilt. Defendant was not confronted with any specific accusations or inquiries. Heidary did not ask defendant about the facts of the murder at all. He testified that in his conversations with defendant, they simply did not "bring it up." We are not evaluating evidence that the jury was likely to consider as incriminating silence in the face of an accusation. Instead, the testimony was that defendant never discussed the case in a setting where his conversations were recorded, and at a time after his attorney advised him "not to talk about the facts." No perceptible probative value may be attributed to defendant's silence where he was not asked about any facts of the case or was otherwise placed in a position where his silence manifested an implied admission of guilt.

The trial court's instructions did not exacerbate the effect of the error. Quite the opposite is true. The jury was not directed to draw an inference of guilt from defendant's *silence*. (*People v. Medina, supra*, 51 Cal.3d 870, 890–891.) The consciousness of guilt instruction advised the jury: "*If* you find that before this trial the defendant made a *willfully false* or *deliberately misleading statement* concerning the crimes for which he is now being tried,

---

[12] Heidary was presented as a prosecution witness. He had several conversations with defendant before he was arrested. On direct and on cross-examination, the attorneys questioned Heidary regarding any factual information defendant provided concerning the homicide. Defendant has not challenged the admission of Heidary's testimony in this appeal, or claimed that his counsel was incompetent for failing to object to it.

you may consider that statement as a' circumstance tending to prove a consciousness of guilt."[13] (Italics added.) The court also ameliorated the impact of the evidence and misconduct with an instruction that defendant had a constitutional right "not to be compelled to testify," and the jury must draw no inference of guilt from his silence to diminish the prosecution's burden to prove guilt beyond a reasonable doubt without his testimony. Thus, reliance by the jury on the instructions to consider defendant's silence for any purpose was extremely unlikely.

While the prosecutor committed misconduct by asserting to the jury that defendant's "[s]ilence in the face" of discussions with Heidary could be considered as evidence of guilt, the focus of the prosecutor's argument of consciousness of guilt was upon defendant's silence *before* his arrest, both when speaking to "family and friends," and "in the face of an accusation" from a police officer. The prosecutor further stated that he was not "relying" on defendant's silence to establish the "whole case." The court also gave an instruction that statements made by attorneys during trial are not evidence, and must be disregarded to the extent they conflict with the instructions on the law.

Finally, the evidence of defendant's guilt was formidable, and was not based in the least on his failure to provide an innocent explanation of the charged crimes to Heidary. Identity of the murderer was the only seriously contested issue in the case. Buchanan's testimony, although inconsistent with his prior statements and laced with confusion, at least convincingly identified defendant as the perpetrator of the murder. Buchanan's account of the murder, when corroborated with the cell phone records, the physical evidence of the murder scene which indicated that the manner in which the murder occurred matched his description, and to a lesser extent the testimony of other witnesses—particularly the victim's mother—was credible to establish identity. The defense did not claim an innocent explanation for the cell phone calls to Buchanan. Instead, the defense challenged the credibility of the prosecution's cell phone record evidence with expert testimony in opposition that sought to dispute the accuracy of the records. Therefore, testimony that defendant failed to explain the cell phone calls did not contradict or damage his defense.

In view of the argument, instructions, and the totality of the evidence, we conclude that beyond a reasonable doubt the admission of evidence of defendant's silence and the prosecutor's improper reference to it in closing argument did not influence the jury verdict. (See *U.S. v. Lopez, supra,* 500 F.3d 840, 846; *People v. Delgado* (2010) 181 Cal.App.4th 839, 853 [104

---

[13] As we view the record, the consciousness of guilt instruction was directed at defendant's pre-*Miranda* statements, not to his silence following his arrest.

Cal.Rptr.3d 495]; *Waldie, supra,* 173 Cal.App.4th 358, 367.) Therefore, the error was harmless, and we find no prejudicial incompetence of counsel. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 [69 Cal.Rptr.2d 784, 947 P.2d 1321].)

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Accordingly, the judgment is affirmed.[16]

Margulies, Acting P. J., and Banke, J., concurred.

A petition for a rehearing was denied January 13, 2011, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 30, 2011, S190123.

---

*See footnote, *ante*, page 1534.

[16] We have denied defendant's petition for writ of habeas corpus, A129565, by separate order filed this date.