Filed 5/5/16  P. v. Tran CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RICKY VAN TRAN,<br><br>Defendant and Appellant. | C070706<br><br>(Super. Ct. No. 94F10752) |

A jury found defendant Ricky Van Tran guilty of two counts of first degree murder and one count of attempted murder and found true the allegation that he personally and intentionally used a firearm in the commission of murder.  The trial court sentenced defendant to two consecutive terms of life in prison without parole, plus a determinate term of 20 years.

Defendant now contends (1) the trial court violated his rights to due process and against self-incrimination when it permitted the prosecutor to question him about his refusal to discuss his case during a jailhouse visit with a friend, and (2) the trial court erred in admitting evidence relating to the arrest of defendant's brother in 1994.

1

Even if the prosecutor's inquiry about defendant's silence was error under *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*), we conclude any such error was harmless beyond a reasonable doubt. In addition, the trial court did not abuse its discretion in admitting the evidence concerning the arrest of defendant's brother because a jury could reasonably find from the prosecutor's offer of proof that it was more likely than not true that defendant learned of his brother's arrest in 1994. We do not consider the remainder of defendant's appellate claims with regard to his brother's arrest because defendant did not raise those claims in the trial court. (Evid. Code, § 353; *People v. Cowan* (2010) 50 Cal.4th 401, 476-477 (*Cowan*); *People v. Partida* (2005) 37 Cal.4th 428, 434-435 (*Partida*).)

We will affirm the judgment.

## BACKGROUND

There was a shooting at Craven Club between 11:30 p.m. and midnight on October 25, 1991. Quon Tran (aka Cujo) and Huy Nguyen (aka Joey) died of gunshot wounds.[1] Long Nguyen was shot in the leg or ankle. Police located a .38 or .357 caliber damaged bullet at the scene.

Police interviewed witnesses to the shooting within hours or days of the shooting. Tuan Phan (aka Bobby) and Hoang Nguyen (aka Spud) identified defendant as the shooter from a photographic lineup and believed defendant was an Oriental Boys (O.B.) gang member. Bobby and Spud identified the suspect vehicle as a blue Oldsmobile. Bobby saw defendant pull out a .38 or .357 revolver. Spud said the shooter's name was Ricky.

Thoai Van Bui and his brother Tuan told police that they heard gunshots coming from a blue, two-door Oldsmobile. Tuan saw a hand go back inside the front window of

---

[1] We will refer to individuals by their nicknames or first names for clarity.

the Oldsmobile.  He reported that the front passenger of the Oldsmobile was a young Asian male with a long ponytail.

Hang Nguyen (aka Jake) told police he saw defendant at Tudo Pool Hall (Tudo) on the night of the shooting.  Tudo was one to one and a half miles from Craven Club. Jake said defendant may have left Tudo with his brother before 10:00 or 10:30 p.m. and defendant's brother was driving a blue, two-door Oldsmobile.  Jake told police defendant said he was going to Craven Club to "check out a party."  According to Jake, defendant said someone at the party tried to hit defendant, and defendant left the party and returned to the pool hall.  Jake said he did not see defendant with a gun on the night of the shooting, but defendant told Jake the day before the shooting that defendant had a .38.

Police determined that defendant's mother owned a 1983 Oldsmobile Cutlass. The car was freshly painted a dark color when a Livermore police officer stopped it 10 days after the Craven Club shooting.

A warrant issued for defendant's arrest.  A nationwide manhunt ensued but law enforcement officials could not locate defendant.

Almost two decades later, on January 20, 2010, defendant was arrested in Cheltenham, Pennsylvania.  Defendant told police his name was Thieu Tran.  Thieu is defendant's younger brother.  Law enforcement officials later determined defendant's true identity using his fingerprints.

Bobby testified at defendant's trial.  He was at Craven Club with Spud, Long, and Cujo on October 25, 1991.  According to Bobby, Long, Spud, and Bobby were members or associates of the Nip Boys gang.  The Nip Boys and the O.B. were rival Asian gangs.

Bobby recalled that a group of people including Long, Cujo, Bobby, and Spud went outside Craven Club at about 10:30 p.m.  Bobby noticed a light blue or grey, two-door Oldsmobile Cutlass approaching slowly, with the headlights off.  Bobby saw defendant in the Oldsmobile when the car was about 10 feet from Bobby.  Bobby knew

3

defendant.[2] Defendant wore his long hair in a ponytail. Bobby turned to Spud and said "is O.B.s" because Spud had a fight with defendant the prior week. Bobby saw defendant lean out the passenger's side window of the Oldsmobile and point a .38 or .357 revolver. Bobby heard four or more loud gunshots and yelled defendant's first name after the gunshots were fired. Phat Duc Lam (aka Patrick) and Man Tran (Cujo's brother) testified that they heard Bobby call out defendant's name after the shooting. Bobby told the jury he had no doubt defendant was the shooter.

Spud's trial testimony was generally consistent with that of Bobby. Spud said he was outside Craven Club with Bobby when he saw two cars drive by slowly. The first car was dark in color and could have been a two-door Oldsmobile. The second car was white in color. Spud saw the person in the front passenger seat of the dark colored car pull out a gun and shoot. The shooter had long hair which was tied back. Spud recognized the shooter because he had seen that person on a couple of prior occasions.

Tuan Bui told the jury he saw a hand going back into the front passenger side of a light colored Oldsmobile after he heard gunshots. He said the front passenger of the Oldsmobile had a ponytail.

Jake testified he and defendant were O.B. gang members. Jake said he rode in a light blue Oldsmobile Cutlass that belonged to defendant's family with defendant's brother Thieu on the night of the shooting. They went to Tudo where Jake saw defendant playing an arcade game. Defendant told Jake he was going to Craven Club to "check something out." Jake saw defendant again at the pool hall at about 9:15 or 9:30 p.m. Defendant told Jake he had been at Craven Club and someone tried to hit him. Defendant left Tudo at about 10:00 or 10:30 p.m. and Thieu might have left with defendant. Contrary to his statement to police, Jake testified that he had never seen defendant with a

---

[2] Defendant similarly testified that Bobby knew defendant and what defendant looked like.

4

gun. However, Jake said defendant told him, sometime before the shooting, that defendant had a .38 caliber gun and kept it in the car.

Defendant testified at his trial, stating he did not remember what he did on October 25, 1991. But he went to Craven Club sometime in late October 1991 to look for his younger brother because his younger brother took their mother's car without permission. Defendant got a ride to Craven Club from someone whose identity he could not recall at the trial.

Defendant saw people, including Bobby, standing outside Craven Club. He knew Bobby and Spud were Nip Boys gang members. Someone defendant associated with Bobby said to defendant, "what the hell are you looking at" or something to that effect. Defendant returned to Tudo at 8:00 or 8:30 p.m. and took his brother home. Defendant denied shooting anyone.

Defendant heard about the shooting at Craven Club and learned that the police were looking for him in relation to the shooting. He was scared because he had heard the police tortured people to get false confessions. He thought no one would believe him because he was a gangster. As a result, he fled Sacramento in his mother's car. He gave police a false name when they pulled him over in Livermore on November 4, 1991, because he knew he was wanted for murder. He fled California and lived in Philadelphia under a false name until his arrest in January 2010. Defendant admitted he gave police his brother's name when he was arrested in 2010.

Defendant denied telling Jake he had a .38 caliber gun and said he did not have a ponytail in October 1991.

Defendant asserted the defense of mistaken identity. His trial counsel theorized that the shots could have come from either car described by the witnesses. Defense counsel noted that witnesses saw flashes coming from a white car and Thang Bui, a Nip Boys gang member, was in the white car. He said there was another Nip Boys gang

5

member in the blue car. Defense counsel argued the shooters saw their fellow Nip Boys gang member Long under attack outside Craven Club and started shooting.

A jury found defendant guilty of the first degree murders of Cujo and Joey and the attempted murder of Long. The jury found true the allegations that defendant personally and intentionally used a firearm in the commission of murders and the attempted murder, and that defendant committed multiple murders. The trial court sentenced defendant to two consecutive terms of life in prison without the possibility of parole, plus a determinate term of 20 years.

## DISCUSSION

### I

Defendant argues the trial court violated his rights to due process and against self-incrimination when it permitted the prosecutor to question him about his refusal to discuss his case with his friend Jake during a jailhouse visit. Defendant says he invoked his right against self-incrimination when he told Jake he did not want to talk about his case. According to defendant, the prosecutor committed *Doyle* error by asking defendant why he would not discuss his case with Jake if he was innocent. Defendant says reversal is required under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].

The prosecutor asked defendant during cross-examination whether he had contact with Jake before his 2010 arrest. The question followed a series of questions about whether defendant ever talked to his brother Thieu and his wife Daisy about what happened in 1991. Defendant replied that he might have had contact with Jake before his arrest. Defendant testified that Jake visited him in jail in 2010 when the prosecutor asked when defendant last spoke with Jake. Defendant could not remember what he and Jake talked about during the jailhouse visit. The prosecutor then asked whether there was any reason defendant did not want to talk openly with Jake about the case. Defendant answered that he knew he could not discuss his case because everything was being recorded. The prosecutor followed up, "Why do you care if you discuss the case if the

6

phone call is recorded? Why does it matter?" Defense counsel objected to the questions and asked to approach the bench. An unreported conference between counsel and the trial judge followed. The prosecutor then continued asking questions about the jailhouse visit. The prosecutor asked why defendant was reluctant to talk openly with Jake about what happened in 1991. Defendant responded that he knew he was not supposed to say anything over the phone. Defendant responded "I don't know" when the prosecutor asked if defendant was concerned about talking with Jake about what happened in 1991.

The Attorney General argues defendant forfeited his claim of *Doyle* error by failing to object in the trial court. Failure to object at the trial can result in forfeiture. (*People v. Hughes* (2002) 27 Cal.4th 287, 332.) Here, however, the record shows defendant's trial counsel objected to the prosecutor's question about why defendant would not discuss his case with Jake. Although the record does not show the basis for counsel's objection and we cannot confirm it was based on *Doyle*, we will assume defendant preserved his claim of *Doyle* error for review and consider the merits of the claim. (*People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6.)

" 'In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony. [Citation.]' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1212.) The Attorney General points out that nothing in the record shows defendant received *Miranda* warnings or invoked his right to remain silent. We agree there is no evidence in the record that defendant was advised of his *Miranda* rights.[3] *Doyle* is not implicated by the use of pre-*Miranda* silence.

---

[3] Defendant filed a motion to augment the record on appeal to include a transcript of Detective Keller's February 3, 2010 interview with defendant or, in the alternative, to direct the trial court to hold record settlement proceedings. "The rules authorizing settlement, augmentation, and correction of the record on appeal concern documents 'file[d] or lodged' in the superior court and transcripts of 'oral proceedings' that occurred

7

(*Fletcher v. Weir* (1982) 455 U.S. 603, 607 [71 L.Ed.2d 490, 494]; *Jenkins v. Anderson* (1980) 447 U.S. 231, 238-239 [65 L.Ed.2d 86, 95-96].)

But even assuming that the prosecutor's inquiry about defendant's silence violated *Doyle,* we conclude beyond a reasonable doubt that any such *Doyle* error did not contribute to the verdict. " ' "When deciding whether a prosecutor's reference to a defendant's post-arrest silence was prejudicial, this court will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt." [Citation.]' " (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1559 (*Hollinquest*).) We will not reverse the judgment for *Doyle* error if we conclude, based on the record as a whole and beyond a reasonable doubt, that the *Doyle* error was harmless. (*Id.* at p. 1558; *People v. Galloway* (1979) 100 Cal.App.3d 551, 559-560 (*Galloway*).)

Defendant's testimony about his jailhouse conversation with Jake was brief, taking up about five pages of over 100 pages of defendant's trial testimony in the reporter's transcript. Moreover, the prosecutor did not mention defendant's testimony about his jailhouse conversation with Jake during his closing and rebuttal statements to the jury. Unlike the prosecutors in *Hollinquest* and *Galloway,* the prosecutor in this case did not argue to the jury that defendant's silence evinced a consciousness of guilt. (*Hollinquest, supra*, 190 Cal.App.4th at p. 1558; *Galloway, supra*, 100 Cal.App.3d at p. 560.)

---

therein. [Citation.] These provisions -- much like the entire network of rules governing matter properly included in the appellate record -- are intended to ensure that the record transmitted to the reviewing court preserves and conforms to the proceedings actually undertaken in the trial court. [Citations.] The settlement, augmentation, and correction process does not allow parties to create proceedings, make records, or litigate issues which they neglected to pursue earlier." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 585.) We deny the unopposed motion because the supporting declaration does not indicate that the transcript of the February 3, 2010 interview was presented in the superior court. (Cal. Rules of Court, rule 8.155; *Vons Companies, Inc. v. Seabest Foods, Inc*. (1996) 14 Cal.4th 434, 444, fn. 3; *Tuilaepa, supra,* 4 Cal.4th at p. 585.) In any event, as we will explain, any *Doyle* error was harmless in this case.

In addition, the evidence of defendant's guilt is strong. Bobby yelled out defendant's name right after the shooting. Bobby knew defendant. Man Tran and Patrick heard Bobby call out defendant's name. Man told a police officer who responded to the scene that Bobby saw the shooter. Bobby's spontaneous and immediate identification of the shooter is compelling evidence.

Bobby and Spud focused their attention on the car within which they saw the shooter. Spud told police he was standing next to Bobby, Bobby asked Spud if Spud knew the person in an approaching car, and Spud recognized that person as defendant. Bobby told police he and Spud recognized the front-seat passenger as an O.B. gang member. Bobby's trial testimony was consistent with his and Spud's reports to police in October 1991. Bobby testified that he saw defendant in the Oldsmobile. He knew defendant was an O.B. gang member. And he told Spud "is O.B.s" as a warning because he knew Spud, a member of the rival Nip Boys gang, had a fight with defendant the prior week. On the other hand, there is no evidentiary support for the defense theory that a Nip Boys gang member in the blue Oldsmobile shot at the crowd because he saw his fellow Nip Boys gang member Long in a fight.

Bobby and Spud told police the shooter's name was Ricky. Although Bobby did not initially tell police that he recognized the shooter because he was worried about being labeled a snitch, Bobby identified defendant as the shooter within a few days after the shooting. Spud also identified defendant as the shooter in October 1991. Bobby told the jury he had no doubt defendant was the shooter.

Bobby reported seeing defendant pull out a .38 or .357 caliber revolver. Police located a .38 or .357 damaged bullet at the scene of the shooting. And defendant told Jake he had a .38 caliber gun.

Defendant's family owned a light blue Oldsmobile Cutlass which matched the description of the suspect vehicle provided by multiple eyewitnesses. Bobby told police the shooter was in a light blue or grey Oldsmobile Cutlass. Spud said the shooter was in

9

a blue Oldsmobile or Buick Regal. Thoai reported that he saw a dark blue Oldsmobile or Monte Carlo driving around in the parking lot before the shooting, and he heard gunshots coming from that car. Tuan told police he heard gunshots coming from the front of a light blue Oldsmobile and saw a hand go back inside the front window of the Oldsmobile after the shooting. Tuan also reported that the front passenger of the Oldsmobile had a long ponytail, which matched the description of defendant's 1991 hairstyle given by Jake and Detective Fong. Bobby, Spud, Tuan, and Thoai also saw a white car driving in the parking lot, but they did not connect the shooting with the white car.

Some witnesses associated the gunshots with a white car. Luong Dinh and Thang Bui were in a white Celica which was behind a blue car that had stopped in front of Craven Club before the shooting. But no one identified Luong or Thang as a shooter.

The trial court instructed the jury to decide what evidence, if any, to believe if it determined there was a conflict in the evidence. The trial court also described factors the jury could consider in evaluating a witness's testimony, including how well the witness could see during the incident. It is clear the jury credited the testimony which associated the gunshots with the blue car.

There was also evidence from which the jury could find that the shooting was gang motivated. Defendant admitted he was an O.B. gang member and that Bobby and Spud were members of the rival Nip Boys gang. Defendant testified he saw Bobby outside Craven Club in late October when he went to the club to look for Thieu; he said someone associated with Bobby challenged defendant. Bobby testified that Spud had a fight with defendant the week before the Craven Club shooting. Detective Fong testified there was a shooting at Tudo, an O.B. hangout, some months before the Craven Club shooting, and there had been incidents involving O.B. and Nip Boys gang members at Craven Club prior to the October 25, 1991 shooting. The gang evidence supported the jury's finding that defendant was the shooter.

10

Further, there was undisputed evidence of consciousness of guilt apart from defendant's silence during the jailhouse conversation with Jake. Defendant fled in the Oldsmobile after he learned he was wanted for the Craven Club shooting. The Oldsmobile had been freshly painted in a different color. Defendant gave police a false name when police stopped him in Livermore, and again when he was apprehended in Pennsylvania. He changed his name and evaded police capture for about 18 years.

On this record, we do not agree with defendant's claim that the prosecutor "tipped the balance" on the question of defendant's guilt by questioning him about his refusal to discuss his case openly with Jake. The evidence of defendant's silence during the jailhouse conversation with Jake did not fill an evidentiary gap in the prosecution's case or touch a " 'live nerve in the . . . defense.' " (*Galloway, supra*, 100 Cal.App.3d at p. 560.) Considering all of the evidence and the closing remarks by counsel and assuming that the prosecutor committed *Doyle* error, any such error was harmless.

II

Defendant also asserts various challenges to the admission of evidence relating to his brother's arrest in 1994. The prosecution offered the challenged evidence to show consciousness of guilt and "an active and continual pattern of flight." Defendant argues the trial court erred in admitting the evidence because the prosecution did not establish the preliminary fact that defendant knew of his brother's arrest.

Although all relevant evidence is admissible, " '[s]ometimes the relevance of evidence depends on the existence of a preliminary fact.' " (*People v. Cottone* (2013) 57 Cal.4th 269, 283.) If the relevance of proffered evidence depends on the existence of a preliminary fact, the proponent of the proffered evidence must produce evidence as to the existence of the preliminary fact. (Evid. Code, § 403.) The jury makes the final determination on the question of whether the preliminary fact exists. (*People v. Lucas* (1995) 12 Cal.4th 415, 466.) But the trial court determines whether the evidence of the preliminary fact is sufficient to allow a reasonable jury to conclude that it is more

11

probable than not that the preliminary fact exists. (*Ibid.; People v. Herrera* (2000) 83 Cal.App.4th 46, 61.) The trial court excludes the proffered evidence under Evidence Code section 403 only if it finds that the showing of the preliminary fact " ' "is too weak to support a favorable determination by the jury." ' " (*Cottone, supra*, 57 Cal.4th at pp. 283-284.) We review a trial court's ruling on the sufficiency of the foundational evidence for a preliminary fact under an abuse of discretion standard. (*People v. Tafoya* (2007) 42 Cal.4th 147, 165; *Lucas, supra,* 12 Cal.4th at p. 466.) Under that standard, we will not disturb the trial court's ruling except on a showing that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

The prosecutor in this case offered to prove the following with regard to the arrest of defendant's brother Thieu. Thieu was arrested in Delaware in 1994 for the October 25, 1991 murders. Thieu told police his name was Ricky Tran. Defendant's wife was present during Thieu's arrest. At that time, defendant and his wife lived one block from Thieu. The trial court concluded the jury could reasonably infer that defendant learned of his brother's arrest in 1994 based on the presence of defendant's wife during Thieu's arrest and the proximity of defendant's residence to the location of Thieu's arrest.

Defendant's trial counsel argues there is no evidence that defendant knew of his brother's arrest and thus no preliminary fact to support the relevance of the challenged evidence. But the trial court ruled the jury could infer knowledge based on the evidence presented. Defendant challenges the sufficiency of that evidence on appeal, but he did not assert such a challenge in the trial court. We do not consider claims raised for the first time on appeal. (*Cowan, supra,* 50 Cal.4th at pp. 476-477; *Partida, supra,* 37 Cal.4th at p. 434-435.) In any event, a jury could reasonably find from the prosecutor's offer of proof that it was more likely than not true that defendant learned of Thieu's arrest in 1994. Accordingly, the trial court did not abuse its discretion in admitting the evidence concerning Thieu's arrest. Although not a basis for our

12

conclusion, we observe that defendant testified he found out Thieu was arrested on a warrant for the Sacramento murders but did not contact the police because defendant did not want to turn himself in.

Defendant also challenges the admission of evidence of Thieu's arrest on relevance grounds. He says the evidence of Thieu's arrest was irrelevant because it was undisputed that defendant fled California and remained at large until 2010. This argument is forfeited by defendant's failure to raise it in the trial court. (Evid. Code, § 353; *Cowan, supra,* 50 Cal.4th at pp. 476-477; *Partida, supra,* 37 Cal.4th at p. 434-435.) Defendant's trial counsel stated in the trial court that defendant would not dispute that defendant knew he was wanted for murder and fled California in 1991. But the statement was made in the context of arguing that evidence relating to Thieu's arrest was unduly prejudicial. Defendant did not object to the evidence relating to Thieu's arrest on relevance grounds. He argued instead that whatever relevance existed was outweighed by the danger of undue prejudice.

Defendant also argues on appeal that evidence of Thieu's arrest was unduly prejudicial because it permitted the prosecutor to introduce evidence of defendant's bad character. Again, defendant did not raise this argument in the trial court. Defendant argued in the trial court that evidence of Thieu's arrest was prejudicial because it involved deceitful conduct by Thieu, not defendant, and because defendant will not dispute that he knew he was wanted for murder and fled California in 1991. Defendant did not preserve his appellate claim for review. In any case, this argument fails on the merits. Even if were we to conclude that the trial court erred in admitting the challenged evidence, any possible error would not require reversal of the judgment because defendant has not shown it is reasonably probable he would have obtained a more favorable result at trial in the absence of the error. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227 [we review error in admitting evidence under ordinary rules of evidence like Evidence Code section 352 under the reasonable probability standard of *People v.*

*Watson* (1956) 46 Cal.2d 818].)  As we have explained, the evidence supporting the conviction is strong.  There was other evidence that defendant fled California and evaded police capture for about 18 years.  And defendant did not object to the other evidence indicating his consciousness of guilt.

In addition, the trial court instructed the jury that evidence of flight cannot prove guilt by itself.  The jury was instructed on the prosecution's burden of proof and the required findings for murder, murder in the first degree, and attempted murder.  The trial court told the jury not to let bias or prejudice influence its decision and to decide the facts based only on evidence presented in the courtroom.  Upon defendant's request, the trial court also twice admonished the jury that it could not use evidence about Thieu's deceit against defendant.  The trial court told the jury that evidence of Thieu's arrest was admitted for the limited purpose of establishing whether defendant knew he was wanted for the 1991 homicides.  The trial judge said whether defendant knew he was wanted for those homicides was a question of fact for the jury to decide.  We presume the jury followed the trial court's instructions.  (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

DISPOSITION

The judgment is affirmed.

/S/
Mauro, J.

We concur:

/S/
Blease, Acting P. J.

/S/
Hoch, J.

14