Filed 6/13/16  P. v. Adams CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KYLE ADAMS,<br><br>    Defendant and Appellant. | H039689<br>(Santa Clara County<br> Super. Ct. No. CC934450)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 20, 2016, be modified to add the following paragraph to section III.A.3 at the bottom of page 12:

Defendant asserts that the evidentiary error violated his "fundamental right to introduce relevant and necessary evidence" under the Sixth Amendment compulsory process clause and the Fourteenth Amendment due process clause, citing *Crane v. Kentucky* (1986) 476 U.S. 683, 690.  We do not reach defendant's constitutional claim because we conclude that any error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18.

There is no change in the judgment.

The petition for rehearing is denied.

1

_____

Bamattre-Manoukian, P.J.

_____

Mihara, J.

_____

Grover, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039689 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC934450) |
| v. | |
| KYLE ADAMS, | |
| Defendant and Appellant. | |

Defendant Kyle Adams was sentenced to 12 years in state prison after he was convicted by a jury of three counts of lewd conduct under Penal Code section 288, subdivision (a).[1]  On appeal defendant argues that the trial court committed prejudicial error by allowing evidence of a pretext phone call in violation of his privilege against self-incrimination under the Fifth Amendment to the federal Constitution; by not allowing testimony to counter the prosecution's claim that he made an adoptive admission during the phone call; and by failing to instruct the jury on unanimity.  He contends that the juvenile court's post-conviction finding that he was unfit for a juvenile court disposition violated his right to equal protection, and that his attorney rendered ineffective assistance by failing to object to testimony that was not presented at the preliminary hearing, by failing to waive the juvenile court's age restriction at the post-conviction fitness hearing, and by failing to object to the trial court's basis for sentencing

---

[1] Unspecified statutory references are to the Penal Code.

1

him to the upper term on the principal charge. Finding no reversible error or ineffective assistance by counsel, we will affirm the judgment.[2]

## I. FACTUAL BACKGROUND

Defendant was born in May 1984. He grew up in San Jose with his brother Jack, and his parents, Dave and Brenda. Dave's sister Sherry also was married with two children, a boy J.M. and a girl T.M. The families were close. Dave and Sherry's mother lived across the street from Dave's family, and Sherry's family, who lived in a nearby city, frequently visited her. Sherry's children sometimes would visit their cousins across the street when Sherry visited her mother. Defendant was two years older than his brother Jack, four years older than J.M., and eight years older than T.M.

When J.M. was in elementary school defendant began molesting him. The molestations, lasting up to 40 minutes, involved genital touching and usually oral copulation. They occurred frequently—about once a month—for several years. Although defendant assured J.M. that it was normal—part of a game—he told J.M. not to tell anyone. J.M. felt manipulated and constrained. Sensing that the behavior was not right, when J.M. was 11 he realized he had an opinion in the matter and could say no. Defendant's pressure eased and the molestations stopped.

J.M. disclosed the molestations to his mother when he was 16. He was confused—questioning his heterosexuality and the normalcy of the sexual contact he had had with defendant—and he felt his mother should know what had happened. J.M. made his mother promise not to tell anyone, and she honored that promise.

About two years after he stopped molesting J.M., defendant molested T.M., then in the third grade. The first incident involved anal penetration. T.M. had been watching her brother and Jack play video games in Jack's bedroom. Defendant entered the bedroom and asked T.M. to come with him to his bedroom to see his fish. T.M. did not

_____

[2] We dispose of defendant's related petition for writ of habeas corpus in case No. H041028 by separate order filed today.

2

want to go.  She hung onto Jack, but J.M. told her to go with defendant and she could play video games with them later.  Defendant grabbed T.M. by the arms and carried her out of Jack's room.  T.M. clung to the door jamb in protest.  Once in his room, defendant grabbed T.M.'s hips, removed his pants, and pulled T.M.'s shorts and underwear to her ankles.  Defendant inserted his penis into T.M.'s anus, and he pushed her forward and pulled her backward by her hips.  T.M. returned to her grandmother's house and did not say anything because defendant was her cousin.

A short time after that incident, defendant had vaginal intercourse with T.M. in his bedroom.  T.M. went to defendant's house by herself, and defendant was in the living room.  He took T.M. to his bedroom, removed both their pants, pulled her onto the bed, sat her on top of him, inserted his penis into her vagina, and moved her hips.  The intercourse was brief.

On a third occasion in the same time frame, defendant forced T.M. to orally copulate him in his bedroom.  He pulled his pants down, put his penis in her mouth and, with his hand on her shoulder, pulled her closer to him.  Fluid entered T.M.'s mouth.  Another incident involving T.M. occurred in a chair in defendant's living room.  And, once during a game of hide-and-seek at T.M.'s house, defendant brought T.M. into her parent's bathroom.  Although she thought something was going to happen, J.M. knocked on the door and the two rejoined the game.

When she was in sixth grade T.M. told her best friend that she had been molested by defendant, although she did not provide details.  She also confided in a girlfriend when she was in eighth grade.  T.M. told her mother about the molestations when she was a sophomore in high school.  T.M. knew her mother was upset after reading text messages between her and her boyfriend, so she wrote her mother a letter to assure her that she was not ready to have sex.  The letter explained what was hard to say face-to-face—that she was scared because of what defendant had done to her.  Sherry read the letter and was furious, commenting about "the same shit that happened to [J.M.]."  Only

3

then did T.M. learn that defendant also had molested her brother. Sherry called defendant's parents and reported defendant to Child Protective Services.

A few weeks later J.M. made a pretext call to defendant assisted by a police officer. The prosecution prepared this transcript of the call: "DEFENDANT: Hello. [¶] J.M.: Hey, is this Kyle? [¶] DEFENDANT: Yeah. [¶] J.M.: Hey Kyle, its [*sic*] uh [J.M.], your cousin. [¶] DEFENDANT: Oh, hey. [¶] J.M.: Hey, uh what's going on? [¶] DEFENDANT: Not much. [¶] J.M.: Uh, no, I mean, you probably, probably know why I am calling you, um I just wanted to, uh, talk to you and kinda see what is going on with the whole family situation cause uh, I am sure you know, your mom or dad's already talked to you cause [T.M.] has uh told my parents what's been going on and stuff, so. I mean, like is everything okay with the family, you know? What's uh going on I was really calling you to ask uh why, you know? I'm not, I'm not angry, I mean, I mean I am but its [*sic*] in the past and uh, and uh, really just trying to figure out why and trying to get over the whole situation in my personal life, you know? (Pause) Hello? Kyle? You there? [¶] DEFENDANT: I said I don't know why she's claiming what she's claiming because nothing happened. [¶] J.M.: Why are you telling me nothing happened, I mean, I mean, how can I believe that when you did stuff to me though? You know, Kyle? (Pause) Are you there buddy? [¶] DEFENDANT: Uh, you know I don't want to discuss this. [¶] J.M.: I mean like are you sorry? I mean can you at least, you know, sorry about anything you did to me? You know what you did to me right? I mean you know how young I was? Hello? [¶] Call Disconnects."

## II. TRIAL COURT PROCEEDINGS

Respondent filed a felony complaint against defendant in superior court[3] alleging three counts of lewd conduct by force upon T.M., a child under the age of 14 (Pen. Code § 288, subd. (b)(1)), and a petition in juvenile court under Welfare and Institutions Code

_____

[3] We sometimes refer to the superior court in this opinion as the criminal court or adult court.

4

section 602, subdivision (a) alleging three section 288, subdivision (b)(1) offenses, naming 10-to-11-year-old J.M. as the victim. The juvenile court found defendant unfit for juvenile court adjudication. After a preliminary hearing, respondent filed a nine-count information in superior court—three counts of lewd conduct by force against T.M. under section 288, subdivision (b)(1) (counts 1 through 3), and six counts of lewd conduct against J.M. (counts 4 through 9), under section 288, subdivision (a).[4] Counts 1 through 3 alleged multiple victim circumstances under the One Strike Law. (§ 667.61, subds. (b), (e).)

A jury returned guilty verdicts on the six section 288, subdivision (a) counts involving J.M. The jury acquitted defendant of the section 288, subdivision (b)(1) counts involving T.M., but it found him guilty on those counts of committing the lesser included offenses of lewd acts under section 288, subdivision (a). The jury found true the multiple victim allegations.

Defendant filed two post-verdict motions. The first—a motion for arrest of judgment—sought juvenile adjudications on the convictions involving J.M. because defendant was under 16 when he committed those offenses, and under the law applicable at that time (former Welfare and Institutions Code section 707, subdivisions (a), (b), and (d)), defendant could not have been tried as an adult. The prosecutor conceded the motion, which was granted, and the matter was remanded to the juvenile court which ultimately dismissed those charges.

Defendant also sought a remand to the juvenile court for a fitness hearing under section 1170.17, subdivision (c) regarding disposition for the three convictions involving T.M., since the lesser included section 288, subdivision (a) offenses were not offenses that qualified for direct filing in adult court without a fitness hearing. The prosecution

---

[4] At the conclusion of the preliminary hearing, the court found that the prosecution had failed to establish the section 288, subdivision (b) force element as to the six counts relating to J.M.

agreed that defendant was entitled to a section 1170.17, subdivision (c) fitness hearing, but requested that the hearing be held in superior court before the judge who had tried the case. The court granted defendant's motion, suspended proceedings, and remanded the matter to the juvenile court for the fitness determination.

The juvenile court ruled that defendant met four of the five fitness factors under section 1170.17, subdivision (b)(2) favoring a juvenile court disposition. But it found defendant unfit under the provision asking "[w]hether the [defendant] can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 1170.17(b)(2)(B)) because he had not rehabilitated in the several years that had passed since the offenses occurred. The court found that rehabilitation would include "redressing the victim and providing restitution; … apologies, … counseling and treatment," and it concluded that it lacked jurisdiction to provide the means of rehabilitation because the juvenile court's jurisdiction over defendant, who was by then 28 years old, had already expired. This court denied a petition for writ of mandate challenging that fitness determination, and the California Supreme Court denied defendant's petition for review without prejudice to defendant raising his fitness challenge on appeal. The matter was returned to superior court, judgment was entered, and defendant was sentenced to a 12-year prison term. Consistent with the remand to the juvenile court and dismissal of counts 4 through 9, the minutes and abstract of judgment do not reflect judgment or sentence on the One Strike Law allegations associated with counts 1 through 3.

### III. DISCUSSION

A.     THE PRETEXT PHONE CALL

Defendant argues that the trial court erred by admitting portions of J.M.'s pretext phone call into evidence, and by excluding evidence that defendant had been advised by his former attorney not to talk about the incidents. At trial, defendant challenged the admission of the pretext phone call as violating his Fifth Amendment right to remain silent. The prosecutor sought admission of the pretext call, specifically defendant's

6

"I don't want to discuss this" response to J.M.'s question "Why are you telling me nothing happened, … I mean, how can I believe that when you did stuff to me though?" as an adoptive admission. Defendant was represented by an attorney when the phone call occurred, and that attorney had advised defendant not to speak with anyone about the matter. Defendant argued that his attorney's advisement was akin to a *Miranda* warning. Without deciding whether any privilege against self-incrimination attached to the pretext call, the court overruled defendant's objection, reasoning that even if the attorney had advised defendant not to discuss the matter, the call itself showed that defendant did not follow that advice, and the statements were made voluntarily.

Defendant then proffered the attorney's testimony to show that his statement to J.M. was not an admission of guilt but instead was prompted by counsel's advice. The attorney had told defendant "what the rules of the game were going to be as far as handling this." He had instructed defendant not to talk to anyone, including his girlfriend and his parents, under any circumstances "until we understand what we are doing here." A few days later, after the police had contacted defendant, the attorney again instructed defendant not to talk to anyone: "I don't care who they are, you don't talk to them without talking to me." The court sustained the prosecutor's hearsay objection to that testimony for lack of foundation.

### 1. The Pretext Call Did Not Implicate the Privilege Against Self-Incrimination

Defendant argues that the trial court violated his privilege against self-incrimination when it allowed admission of his response to J.M.'s inquiry: "Why are you telling me nothing happened, I mean, I mean, how can I believe that when you did stuff to me though?" According to defendant, his response—"Uh, you know I don't want to discuss this"—and his terminating the phone call were an exercise of his privilege against self-incrimination and should not have been allowed as evidence of an adoptive

7

admission of guilt. (See Evid. Code, § 1221 [statement by another may be deemed adopted by party's "words or other conduct"].)

An adoptive admission is admissible unless the circumstances "lend themselves to an inference that [a defendant] was relying on the right of silence guaranteed by the Fifth Amendment." (*People v. Preston* (1973) 9 Cal.3d 308, 313–314.) The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) The privilege permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate that person in future criminal proceedings. (*Minnesota v. Murphy* (1984) 465 U.S. 420, 426.) The Fifth Amendment protects a person from compelled self-incrimination by the state. (*Malloy v. Hogan* (1964) 378 U.S. 1, 6; *People v. Ledesma* (2006) 39 Cal.4th 641, 693.) Absent government coercion, "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." (*Colorado v. Connelly* (1986) 479 U.S. 157, 166.)

Citing *People v. Cribas* (1991) 231 Cal.App.3d 596 (*Cribas*), defendant argues that J.M. was acting as a state agent when he placed the pretext call. *Cribas* involved a telephone conversation between a rape victim and a jailed defendant who had appointed counsel. The rape victim was provided housing by the state, making her, in the court's view, a paid informant, and she was instructed to extract incriminating statements from the defendant. (*Id*. at p. 604.) The court held that the state violated the defendant's Sixth Amendment right to counsel by having the victim "surreptitious[ly] question[]" the defendant "about a matter on which counsel had been appointed." (*Id*. at p. 605.)

The defendant in *Cribas* did not claim a Fifth Amendment violation, and *Cribas*'s Sixth Amendment analysis is not relevant to defendant's Fifth Amendment claim. (*Illinois v. Perkins* (1990) 496 U.S. 292, 299.) Absent a showing of government compulsion or coercion which is not present here, using an undercover law enforcement

8

officer to elicit a voluntary confession from a suspect does not violate the self-incrimination clause. (*Id*. at pp. 297–298.) Defendant's Fifth Amendment rights were not implicated, much less violated, by the phone call or its use at trial.

Defendant's reliance on *People v. Eshelman* (1990) 225 Cal.App.3d 1513 and *People v. Hollinquest* (2010) 190 Cal.App.4th 1534 is misplaced. Those cases involved the application of *Doyle v. Ohio* (1976) 426 U.S. 610, 619 (*Doyle*) to a suspect's post-arrest, post-*Miranda* statements made to third parties. In *Doyle*, the Supreme Court held that using post-arrest silence following *Miranda* warnings to impeach a defendant's trial testimony violated due process. Because *Miranda* warnings expressly assure that silence will carry no penalty, "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." (*Id.* at p. 617.) Under those circumstances, the Court reasoned that "it would be fundamentally unfair and a deprivation of due process" to allow the arrested person's silence to be used against him at trial. (*Id*. at p. 618.)

Here, the pretext call occurred before any arrest or custodial interrogation triggering *Miranda* warnings. Nor does *People v. Cockrell* (1965) 63 Cal.2d 659, also cited by defendant, establish that J.M.'s phone call triggered Fifth Amendment protections. *Cockrell* involved testimony by a police officer that defendant, while in police custody, had remained silent in the face of a witness's accusatory statement made in his presence. (*Id*. at p. 669.) The California Supreme Court concluded that the police officer's testimony was inadmissible because, " 'after the arrest and during an official examination, while [the defendant] is in custody, it is common knowledge that he has a right to say nothing.' " (*Id*. at p. 670.) Although the defendant in *Cockrell* testified that his attorney had told him "never to say anything when he was in trouble until he had legal advice," (*id.* at p. 669) that statement was not the basis for *Cockrell*'s conclusion that the police officer's testimony was inadmissible. Indeed, the court explained, in light of its

9

ruling, it was "unnecessary to consider what effect, if any, Mr. Cockrell's explanation at the trial for his silence had on the admissibility of [the] testimony." (*Id*. at p. 670, fn. 4.)

## 2. Exclusion of Former Counsel's Testimony

Defendant asserts that the trial court erred by not allowing his former attorney to testify regarding his admonition to defendant not to discuss the matter with anyone. The trial court agreed with the prosecutor that the testimony would be hearsay, and it would be unfair to allow the testimony to be used for the non-hearsay purpose of its effect on defendant because the prosecution would be foreclosed under *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*) from countering that inference. The only purpose for which the testimony would have been admissible, according to the prosecutor, would have been to corroborate defendant's testimony that he had acted under counsel's advisement. Without defendant's testimony, the attorney's testimony suffered from a lack of foundation. Evidentiary rulings are generally reviewed for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) An abuse of discretion occurs when the trial court misapplies the law. (*Hernandez v. Amcord, Inc*. (2013) 215 Cal.App.4th 659, 680.)

Defendant argues that the evidence was relevant to show that his response to J.M. was not an adoptive admission but rather driven by his attorney's directive. Defendant relies on *People v. Mendoza* (2007) 42 Cal.4th 686 (*Mendoza*), a case addressing testimonial evidence used by the prosecution to establish a defendant's motive for killing his step-daughter. The decedent's mother testified that she had told the defendant at several points leading up to the murder that her daughter had told her that the defendant had sexually abused her. (*Id*. at p. 691.) The court held that decedent's statement to her mother was not hearsay because it was not being offered for its truth, i.e., that the defendant had molested her. Rather, the testimony was offered to show the defendant's state of mind (that he had knowledge of the decedent's accusation) and as a motive for killing the decedent. (*Id*. at p. 697.)

10

As in *Mendoza*, the statements of defendant's former attorney were not hearsay. The attorney had personal knowledge that he had admonished defendant not to speak to anyone, and defendant sought that testimony to show that he acted in conformity with that admonition. This case is an example of an " 'important category of nonhearsay evidence—evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief.' " (*People v. Scalzi* (1981) 126 Cal.App.3d 901, 907.) It is true that the attorney could not testify as to whether defendant's response to J.M. was motivated by his admonition. But the prosecution put defendant's state of mind in issue by asserting that defendant's response to J.M. was an admission of the truth of J.M.'s statement, and defendant had a right to rebut that inference with circumstantial evidence showing a different reason for his response.

We disagree with respondent that defendant needed to establish reliance on the attorney's admonitions as a foundational matter or that the court's rejection of defendant's Fifth Amendment claim somehow foreclosed his ability to use the testimony to rebut the prosecution's argument that defendant's reticence amounted to an adoptive admission. In *Mendoza*, the prosecutor provided no such reliance and was offering the testimony to provide a motive for defendant's conduct. (*Mendoza*, *supra*, 42 Cal.4th at p. 698.) Although in this case the trial court rejected defendant's Fifth Amendment claim, that ruling did not preclude defendant from countering the prosecution's argument with circumstantial evidence showing that his reticence, and ultimate refusal to speak with J.M., were not admissions. Although defendant did not heed counsel's advice in the strictest sense needed to invoke the Fifth Amendment right to remain silent—a right the trial court assumed attached to the pretext phone call but, as we have explained above, had not actually manifested—the evidence was relevant to show why he refused to engage with J.M.

11

We do not see unavoidable *Griffin* error as pressed by respondent. *Griffin* holds that the Fifth Amendment forbids a prosecutor from commenting to a jury on a defendant's silence. (*Griffin*, *supra*, 380 U.S. 609, 615.) *Griffin* does not apply to any silence but to constitutionally invoked silence. (*People v. Lewis* (2001) 25 Cal.4th 610, 670.) As we have explained, the pretext phone call did not implicate the Fifth Amendment, so defendant's refusal to continue the conversation with J.M. did not invoke a Fifth Amendment right to silence.

### 3. Erroneously Excluding the Attorney's Testimony Was Harmless

We analyze evidentiary error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which states that an error does not require reversal unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error." (See also Evid. Code, § 354, precluding reversal unless the evidentiary error "resulted in a miscarriage of justice.") We conclude that it is not reasonably probable that the jury was influenced by the omission of counsel's testimony to defendant's detriment. Foremost, this appeal challenges only the three convictions pertaining to T.M., and the attorney's testimony was directed at rebutting the argument that defendant, through his words and actions, admitted to molesting J.M. To the extent J.M.'s testimony bolstered T.M.'s credibility, J.M. testified in detail to the molestations and his testimony was corroborated by his mother. More significantly, J.M.'s mother testified that T.M. did not learn of the molestations involving J.M. until T.M. told her what defendant had done to her, undercutting defendant's argument that T.M. fabricated the charges. Finally, T.M.'s testimony was corroborated by her mother and her school friend. On this record, it is not reasonably probable that the jury would have reached a result more favorable to defendant regarding any of the T.M. molestations had defendant's former counsel testified.

**B.     UNANIMITY INSTRUCTION**

Defendant argues that the trial court's failure to instruct the jury on unanimity deprived him of due process under the Fifth and Fourteenth Amendments.  The California Constitution guarantees a criminal defendant the right to a unanimous jury verdict. (*People v. Jones* (1990) 51 Cal.3d 294, 321.)  To find a defendant guilty of a particular crime, the jury must unanimously agree that the defendant committed the same specific act constituting the crime.  (*People v. Crow* (1994) 28 Cal.App.4th 440, 445.)  When a single crime is charged but "the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act."  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  "If the prosecution is to communicate an election to the jury, its statement must be made with as much clarity and directness as would a judge in giving instruction."  (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539.)  The instruction should be given sua sponte " 'where the circumstances of the case so dictate.' "  (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.)  We review the court's failure to sua sponte instruct on unanimity de novo. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568 (*Hernandez*).)

**1.     The Prosecution Presented Evidence of Four Discrete Crimes Without Communicating an Election**

T.M. testified on direct examination to three separate lewd acts by defendant, all occurring in defendant's bedroom.  The first act was anal penetration occurring the day T.M. was watching J.M. and Jack play video games in Jack's bedroom.  The second act, close in time, involved vaginal penetration.  The third act involved oral copulation.  T.M. also testified on direct examination that something happened once when she went to defendant's house for pepper, but she could not recall whether that was the same occasion as the second act she had just described.  On cross-examination she further testified about an incident involving a living room chair.  She remembered defendant pulling her pants down and facing away from him while he was in the chair, and she

13

acknowledged telling the police that defendant had intercourse with her at that time. She clarified that she had testified on direct examination to three main incidences that "stuck out" to her, and none of those incidents was the chair incident.

During his opening statement, the prosecutor did not describe the three lewd acts he intended to prove, other than to say that there were three separate incidents when T.M. was molested: "She was raped. She was sodomized. She was forced to orally copulate the defendant on those three occasions; not every single time, but that's what happened in those three incidents." In closing, the prosecutor argued that T.M. remembered "three or four events; three are charged." He summarized the three acts T.M. described on direct examination, referenced a hide-and-seek incident where nothing happened, and then addressed the fourth act: "She also remembered an incident with a chair. She was -- she was, ultimately, certain and not certain that that was the exact same day she was raped in the bedroom, but she remembered something happening with the chair." The prosecutor never communicated to the jury that the People were proceeding on only the three acts T.M. described on direct examination. Although the prosecutor did not emphasize the chair incident, he referenced it in his closing argument and never suggested that it could not be used to form the basis of any conviction.

### 2. The Evidence Did Not Show a Continuing Course of Conduct

Respondent argues that a unanimity instruction was unnecessary because the chair incident and the bedroom rape were part of a continuing course of conduct. "Continuous course of conduct" is an exception to the general rule that either the prosecution must elect the particular act upon which it relies or the court must instruct on unanimity. The exception applies when " 'the acts are so closely connected that they form part of one and the same transaction,' " or when " 'the statute contemplates a continuous course of conduct over a series of acts over a period of time.' " (*Hernandez*, *supra*, 217 Cal.App.4th at p. 572, italics omitted.) Respondent contends that, but for a brief wavering upon repeated cross-examination, T.M. "maintained throughout the trial that

14

whatever happened at the chair occurred just as she stepped into [defendant's] house and that [defendant] then took her from the chair to the bedroom, where he vaginally raped her." But T.M.'s testimony was not so exact. She never testified that she was raped on the chair and the rape continued in the bedroom. Rather, she testified that she did not know how she ended up in the bedroom, and she was clear that the chair incident—which she agreed with counsel on cross-examination involved intercourse—was a separate incident that may or may not have occurred the same day as the bedroom rape.

### 3. The Failure to Instruct on Unanimity Was Harmless

Even though a unanimity instruction should have been given, there are no grounds for reversal whether we apply the heightened "harmless beyond a reasonable doubt" standard applicable to federal constitutional error (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)) or the standard for state law error under *Watson*. (See *People v. Vargas* (2001) 91 Cal.App.4th 506, 561–562 [noting split of authority on the proper standard for reviewing failure to instruct on unanimity].) Error in failing to give a unanimity instruction is harmless under *Chapman* when "the defendant offered the same defense to all criminal acts, and 'the jury's verdict implies that it did not believe the only defense offered.' " (*Hernandez, supra,* 217 Cal.App.4th at p. 577.) When the sole defense is credibility, the error is harmless when " 'the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence.' " (*Ibid*.)

Here, the central issue at trial was whether T.M. and J.M. were being truthful. Defendant never argued that a particular incident was not proven because of an alibi defense or because of insufficient evidence. Indeed in closing argument to the jury, defendant presented a unitary defense—that T.M. made up the allegations to deflect her mother's anger from the text messages she was exchanging with her boyfriend, and that J.M. fabricated his testimony to help his sister. Defendant never addressed the specific incidents described by T.M., other than to note that his brother Jack had no recollection

15

that defendant took T.M. from his bedroom while he and J.M. were playing video games, to buttress his argument that all allegations were invented. But defendant also conceded "If you believe [T.M.], if you believe [J.M.], you can convict him."

The defense was an all or nothing proposition, and the jury resolved the credibility issue against defendant and in favor of J.M. and T.M. Even though the jury did not find force as had been alleged in the T.M. molestations, that does not undermine the jury's resolution of credibility in favor of T.M. A jury could believe T.M.'s testimony without finding that defendant used force to commit the acts. Further, there is no reasonable probability that a juror would have rejected T.M.'s detailed direct-examination testimony regarding three specific lewd acts and at the same time accepted her oblique testimony regarding the chair incident. The absence of a unanimity instruction was harmless beyond a reasonable doubt under *Chapman* as well as under the less demanding *Watson* standard.

## C. THE BATHROOM INCIDENT

T.M. did not testify about a bathroom incident at the preliminary hearing. On cross-examination at trial she referenced an incident she had not mentioned before "because nothing happened." On redirect, she explained that during a game of hide-and-seek at her house, defendant brought her into her parent's bathroom. It was dark and she heard defendant unzip his zipper. But J.M. knocked on the door, the two rejoined the game, and nothing happened. Defendant argues that counsel was ineffective for failing to request that the bathroom testimony be excluded or seek a clarifying instruction that the testimony could not be used to convict defendant. Defendant asserts that the testimony was prejudicial because the jury could have based one of the convictions on the bathroom incident.

A defendant cannot be convicted of an offense which was not shown at the preliminary hearing to have been committed. (*People v. Graff* (2009) 170 Cal.App.4th 345, 360–361.) Indeed, the cases cited by defendant find error

16

when the offense proven at trial was not necessarily the same offense shown at the preliminary hearing.  (*People v. Burnett* (1999) 71 Cal.App.4th 151; *People v. Dominguez* (2008) 166 Cal.App.4th 858.)  T.M. testified to an incident where "nothing happened."  That testimony did not prove any allegation contained in the information, and the prosecutor did not argue that the bathroom incident was the basis for any charged offense.  Accordingly, counsel may have understood that T.M.'s hide-and-seek testimony was not presented for the jury's consideration as a convictable offense, making any clarifying instruction unnecessary.  Further, counsel may have made a tactical decision not to draw attention to the testimony by objecting under Evidence Code section 352.  Because defendant has not shown deficient performance, his ineffective assistance of counsel claim fails.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)

## D.     FITNESS DETERMINATION[5]

Defendant challenges the juvenile court's ruling that he was unfit for a juvenile disposition, claiming an equal protection violation and ineffective assistance of counsel.  Before turning to those claims, we address the Attorney General's contention that defendant was ineligible for a post-conviction fitness hearing (even though he had received one) and required to be sentenced as an adult.

### 1.     Defendant Was Entitled to a Fitness Hearing Under Penal Code Section 1170.17, Subdivision (c)

Relying primarily on California Rules of Court, rule 4.510(a) (Rule 4.510(a)), the Attorney General asserts that defendant was required to be sentenced as an adult on the counts relating to T.M. (counts 1 through 3), even though the prosecutor took the opposite view in the trial court.  Rule 4.510(a) provides:  "If the prosecuting attorney lawfully initiated the prosecution as a criminal case under Welfare and Institutions Code section 602(b) or 707(d), and the minor is convicted of a criminal offense listed in those

---

[5] All references to "section 602" and "section 707" are to the Welfare and Institutions Code.

17

sections, [then] the minor must be sentenced as an adult." Respondent argues that Rule 4.510(a) mandates defendant receive an adult sentence because the prosecution was initiated under section 707, subdivision (d), and defendant was convicted of an offense listed under section 602, subdivision (b).

Section 1170.17 governs the sentencing of persons prosecuted as adults for offenses committed before age 18. It is apparent from the reference to section 1170.17 in the caption to Rule 4.510(a) that the rule is intended to facilitate implementation of that statute. Accordingly, the reference in Rule 4.510(a) to "an offense listed in Welfare and Institutions Code section 602(b)" should be read in the context of the statutory procedure for a post-conviction fitness hearing laid out in section 1170.17. (*In re Alonzo J.* (2014) 58 Cal.4th 924, 933.)

Section 1170.17 governs sentencing when a person is charged with committing an offense while under the age of 18, the prosecution is lawfully initiated in adult criminal court without a fitness hearing, and the person is convicted of *any* criminal offense. (§ 1170.17, subd. (a).) Section 1170.17 applies to defendant's convictions because defendant was charged with committing forcible lewd acts against T.M. under section 288, subdivision (b) when he was under age 18, the prosecution was lawfully initiated in superior court without a fitness hearing under section 707, subdivision (d), and defendant was convicted of lesser included lewd acts under section 288, subdivision (a). (See *People v. Villa* (2009) 178 Cal.App.4th 443, 451.)

Section 1170.17, subdivision (a) requires sentencing as an adult except under circumstances described in section 1170.17, subdivisions (b) or (c). Subdivisions (b) and (c) both provide for post-conviction fitness hearings to determine whether the person is fit for a juvenile disposition "where the conviction is for the type of offense which, in combination with the person's age at the time the offense was committed, makes the person eligible for transfer to a court of criminal jurisdiction[.]" (§ 1170.17 (b), (c).) Section 1170.17, subdivision (b) provides for a post-conviction fitness hearing when the

18

person would be subject to criminal court jurisdiction pursuant to a rebuttable presumption that the person is not fit for the juvenile court, and where prosecution for the offense could not lawfully be initiated in adult court. Subdivision (c) provides for a post-conviction fitness hearing when the person would be subject to criminal court jurisdiction subject to a rebuttable presumption of juvenile court fitness. A subdivision (b) fitness hearing places the burden on the defendant to show fitness for a juvenile court disposition. Under subdivision (c), the prosecution has the burden to show that the defendant is unfit for a juvenile court disposition.

Defendant was convicted of committing lewd acts under section 288, subdivision (a) in 2001 when he was 16 or 17 years old. Thus, under section 1170.17, we must determine whether a lewd act under section 288, subdivision (a), committed by a 16 or 17-year old, is "the type of offense" that would make defendant eligible for a pre-trial fitness hearing and whether the rebuttable presumption for that fitness determination favors juvenile court jurisdiction or adult court jurisdiction. To answer those questions, we look to section 707, governing a person's eligibility for a pre-trial fitness hearing, and sections 602, governing the juvenile court's jurisdiction.

Under section 707, subdivision (a)(1), a minor charged with committing a lewd act under section 288, subdivision (a) at age 16 or 17 would be subject to a fitness hearing with a rebuttable presumption of juvenile court fitness, and thus "eligible for transfer" to adult court under section 1170.17, provided the "minor is alleged to be a person described in subdivision (a) of Section 602 by reason of the violation[.]" If defendant's convictions are for offenses falling under section 707, subdivision (a)(1), he is entitled to a post-conviction fitness hearing with a rebuttable presumption favoring a juvenile court disposition under section 1170.17, subdivision (c).

Under section 602, subdivision (a), a person who commits a crime when he or she is under age 18 falls under the juvenile court's jurisdiction "except as provided in subdivision (b)." Section 602, subdivision (b) mandates prosecution in the adult court for

19

murder (§ 602, subd. (b)(1)) and certain sex offenses (§ 602, subd. (b)(2)) alleged to have been committed by persons 14 or older. Persons alleged to have committed a sex offense enumerated under section 602, subdivision (b)(2) fall under adult court jurisdiction (not the juvenile court's section 602, subdivision (a) jurisdiction) only "if the prosecutor alleges that the minor personally committed the offense, and if the prosecutor alleges one of the circumstances enumerated in the One Strike law [§ 667.61, subd. (d) or (e)][.]" (§ 602, subd. (b)(2).) The sex offenses listed under section 602, subdivision (b)(2) include a lewd act under section 288, subdivision (a) when the offender does not qualify for probation under section 1203.066, subdivision (c). (§ 602, subd. (b)(2)(G).)[6]

Defendant's section 288, subdivision (a) convictions are for the type of offense that would make defendant eligible for a pre-trial fitness hearing with the presumption of juvenile court fitness under section 707, subdivision (a)(1) (§ 1170.17, subd. (c)) because the convictions, as they stand, are unsupported by any One Strike Law allegation. Under section 1170.17, defendant's convictions, not the charging document, determine whether defendant is entitled to a post-conviction fitness hearing. Although One Strike Law allegations were made in connection with counts 1 through 3 and the jury found those allegations to be true, the offenses that supported those allegations (counts 4 through 9) were deemed juvenile adjudications and dismissed. Thus, defendant was convicted of offenses that could not lawfully support One Strike Law allegations, and therefore defendant could not be prosecuted for those offenses under section 602, subdivision (b).

The section 288, subdivision (a) offenses here are "the type of offense which, in combination with the person's age at the time the offense was committed, makes the person eligible for transfer to a court of criminal jurisdiction," entitling defendant to a

---

[6] Because we conclude the reference in Rule 4.510(a) to a conviction for "a criminal offense listed" in section 602, subdivision (b) is to a conviction (other than murder) associated with a One Strike Law allegation, we need not address whether defendant's section 288, subdivision (a) offenses qualified for probation under section 1203.066, subdivision (c).

20

post-conviction fitness hearing under section 1170.17, subdivision (c). The prosecutor's concession that defendant was entitled to that fitness hearing was proper.

### 2. Equal Protection

Defendant was entitled to a juvenile disposition on counts 1 through 3 unless the prosecution prevailed at the fitness hearing by rebutting the presumption that defendant was a "fit and proper subject to be dealt with under the juvenile court law." (§ 1170.17, subd. (c)(2).) A fitness determination under section 1170.17(c)(2) is based on five criteria listed in subdivision (b)(2): "(A) The degree of criminal sophistication exhibited by the person. (B) Whether the person can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. (C) The person's previous delinquency history. (D) Success of previous attempts by the juvenile court to rehabilitate the person. (E) The circumstances and gravity of the [present] offense." (*Id*., subds. (b)(2)(A)–(E), (c)(2).)

The juvenile court found that defendant met four of the five fitness criteria for a disposition under juvenile court law. But it found defendant unfit for a juvenile disposition under subdivision (b)(2)(B) (Factor (B)) because defendant had not been rehabilitated and the juvenile court could not retain jurisdiction over defendant during the rehabilitative process. Under Welfare and Institutions Code section 607, subdivision (a), the juvenile court loses jurisdiction over a person convicted under section 288, subdivision (a) at age 21, and defendant was 28 years old at the time of the fitness hearing.

Defendant argues that the juvenile court's ruling violated equal protection because he, as a member of the group of "juveniles who commit crimes at the age of 17 but are denied a juvenile disposition since they are not charged until they are 25 years old," is treated differently than "juveniles who commit crimes at the age of 17 and receive a juvenile disposition after being promptly charged." An equal protection claim requires a showing that " 'the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th

21

228, 253.) To determine whether the classification is legally justified, we focus on the distinctions between groups drawn by the statute and apply the appropriate level of judicial scrutiny based on the nature of the distinctions made. (*People v. MacKenzie* (1995) 34 Cal.App.4th 1256, 1269.)

### a. Distinguishing classification

Defendant challenges the classification drawn by section 1170.17, subdivision (c)(2), which directs the trial court to determine whether a person who commits a crime as a minor, is prosecuted in criminal court under section 707, subdivision (d), and is convicted of a lesser included offense that is not encompassed by section 707, subdivision (d), should be subject to a juvenile disposition. The law classifies persons committing the same crimes into two groups—those who are fit for a juvenile court disposition and those who are not fit for a juvenile court disposition. Factor (B), which defendant failed to satisfy, further distinguishes between persons who can be rehabilitated before expiration of the juvenile court's jurisdiction, and persons who cannot be rehabilitated before they age out of that court's jurisdiction. Factor (B) does not prevent a finding of rehabilitation for a defendant who receives a fitness hearing after aging out of the juvenile court's jurisdiction. Assuming the other fitness factors are met, persons in the first group, regardless of their age, will receive a juvenile court disposition while persons in the latter category, also regardless of age, will be sentenced as adults.

### b. Applicable level of scrutiny

Defendant argues that his equal protection claim implicates a liberty interest requiring strict scrutiny review. He relies on *People v. Olivas* (1976) 17 Cal.3d 236, which applied strict scrutiny to a statute authorizing a criminal court to sentence an adult misdemeanant under the age of 21 to the Youth Authority in lieu of county jail. The maximum adult term of incarceration for the misdemeanor conviction in *Olivas* was 180 days, but under then-existing law 19-year-old Olivas could be held in the Youth

Authority until his 23d birthday.  (*Id.* at pp. 241–243.)  *Olivas* defined the misdemeanant's liberty interest to include freedom from incarceration and parole conditions imposed by the Youth Authority and concluded that the fundamental liberty interest triggered strict scrutiny.  (*Id.* at p. 251.)

The California Supreme Court has read *Olivas* narrowly, noting " 'California courts have never accepted the general proposition that "all criminal laws, because they may result in a defendant's incarceration, are perforce subject to strict scrutiny[.]" ' " (*People v. Wilkinson* (2004) 33 Cal.4th 821, 838.)  Mindful of the limited application of *Olivas*, we will not apply strict scrutiny here because section 1170.17, subdivision (c)(2) does not impose incarceration and at most indirectly implicates a liberty interest.  Even though older defendants in need of rehabilitation may be less likely to be found fit under section 1170.17 than younger defendants, as defendant's characterization of the disparity shows, age is not a suspect class triggering heightened scrutiny.  (*Hicks v. Superior Court* (1995) 36 Cal.App.4th 1649, 1657.)

Because the distinction drawn by section 1170.17 subdivision (c) does not involve a suspect class or directly affect a fundamental interest, the legislation is presumed to be constitutional and will be upheld so long as any reasonably conceivable state of facts could provide a rational basis for the classification.  (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 480–482.)  Here there is a rational basis to distinguish persons tried in adult court for offenses committed as minors based on their fitness for a juvenile disposition.  The legislature has deemed some offenses serious enough to warrant adult sentences, other offenses to warrant a juvenile court disposition, and others to warrant adult sentences depending on the fitness of the offender.  (§ 602, subd. (b), § 707, subds. (b), (d)(2).)  The fitness inquiry, designed to identify whether the offender is "amenable to the care, treatment, and training program available through the facilities of the juvenile court" (§707, subd. (a)(1)), is a rational way to identify persons who exhibit criminal sophistication or antisocial behavior, who will not benefit from consideration

23

under juvenile law, or who do not realistically belong in the juvenile court system. (*Hicks v. Superior Court*, *supra*, 36 Cal.App.4th at p. 1659.) And specifically, "the length of time treatment is likely to be necessary is an appropriate factor for the juvenile court to consider in determining whether a minor is fit or unfit[.]" (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 713.) Indeed, the juvenile court may find a minor unfit if rehabilitation would require treatment beyond the mandatory discharge date. (*Id*. at p. 715.)

### 3. Ineffective assistance of counsel—Age restriction waiver

The juvenile court's jurisdiction over a person convicted of a lewd act under section 288, subdivision (a) extends to age 21. (Welf. & Inst. Code, § 607, subd. (a).) Positing that the juvenile court's age restriction is designed solely for the minor's benefit, defendant contends that the juvenile court's jurisdiction is waivable in the same way other statutory restrictions designed for a party's benefit can be waived. Defendant presses that counsel was ineffective by failing to argue that the juvenile court could retain jurisdiction if defendant waived the age restriction, because he would have been fit for a juvenile court disposition absent the age cap.

We note at the outset that the juvenile court's age restriction is jurisdictional and not waivable. " 'A "juvenile court" is a superior court exercising limited jurisdiction arising under juvenile law.' " (*In re M.C.* (2011) 199 Cal.App.4th 784, 790; *Daniel V. v. Superior Court* (2006) 139 Cal.App.4th 28, 47.) Its authority is delegated by the Legislature, and it lacks power to exceed that legislative grant of authority. (*In re Silvia R.* (2008) 159 Cal.App.4th 337, 345–346.) Restrained by its limited authority, the juvenile court cannot expand the jurisdiction created by Welfare and Institutions Code section 607. (See *In re Antoine D.* (2006) 137 Cal.App.4th 1314, 1320, 1323 [recognizing that section 607 functions to extinguish juvenile court jurisdiction].)

Further, the age restriction cannot be a waivable benefit to someone who is excluded from receiving those benefits. Unlike the defendant in *Rucker v. Superior*

24

*Court* (1977) 75 Cal.App.3d 197, 200, who at age 18 fell within the juvenile court's jurisdiction but moved for a finding of unfitness and demanded prosecution as an adult, defendant possessed no juvenile court protection to waive.

Trial counsel's failure to argue that the juvenile court could retain jurisdiction if defendant waived the age restriction does not constitute deficient performance or prejudice. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 687.) Accordingly, this ineffective assistance of counsel claim fails.

## E. SENTENCING CHALLENGES

### 1. Ineffective Assistance of Counsel

After the trial court stated its intent to deviate from the probation department's recommended six-year prison term and instead sentence defendant to the maximum allowable term,[7] defendant delivered an exhaustive argument in support of the recommended six-year sentence. Counsel repeatedly pressed that defendant was not a danger to society in light of two expert reports explaining that defendant had been a mentally challenged adolescent whose behavior was attributable to sexual experimentation, who was not a pedophile, and who had committed no sexual offenses in the ten years since he had abused T.M.

Defendant referred to remarks from the juvenile court judges involved in this case. The judge who initially found defendant unfit (prompting the charges relating to J.M. to be filed in adult court) had declined to remand defendant into custody based on the absence of dangerousness. More recently, the judge who had found defendant unfit for the juvenile court in the T.M. molestations had commented that defendant probably would have received a juvenile disposition including counseling and treatment had he been convicted at age 17. Defendant also argued that the court could not rely on T.M.'s

---

[7] The maximum aggregate prison term for defendant's three section 288, subdivision (a) convictions is 12 years. (§§ 288, subd. (a); 1170.1, subd. (a).)

25

version of facts adopted in the probation report because the jury rejected the force element of those offenses.

The trial court nonetheless sentenced defendant to the maximum 12 years imprisonment. The sentence was based on defendant's dangerousness to society, T.M.'s youth and vulnerability, defendant's position of trust, and the fact that the sexual abuse occurred over an extended time period. The court elaborated: "The victim and her family's testimony in this case … so eloquently … articulated the fact that the defendant's actions ripped their family apart, and the damage this caused, and the repercussions that are still being felt at this time, and I'm confident will be felt in the future. … The defendant's acts were callous. They were brutal. … They robbed [T.M.] of her childhood." The court opined that defendant's family was in denial, and defendant, who had only recently expressed remorse, was a predator and danger to society. In addition to mandatory fines and fees, the court ordered $315 restitution to the Victim Compensation and Government Claims Board, and restitution to T.M. in an amount to be determined.

Defendant argues that the court's stated reasons for imposing the upper term on count 1—dangerousness to society and T.M.'s youth and vulnerability—were manifestly improper, and that trial counsel was ineffective for failing to object to those reasons. Defendant casts his claim as ineffective assistance of counsel based on the California Supreme Court's holding that that the waiver doctrine "should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices." (*People v. Scott* (1994) 9 Cal.4th 331, 353.) But defendant's claim fails because he cannot show deficient performance. Counsel did preserve defendant's dangerousness challenge and, as we just noted, exhaustively argued against a dangerousness finding.

Defendant's dangerousness challenge also fails under the abuse of discretion standard. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847 [sentencing decision reviewed

26

for abuse of discretion].)  "The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.' "  (*Ibid.*)

The trial court may rest its sentence on the victim's vulnerability, as well as the cruelty and callousness of the offense, and defendant taking advantage of a position of trust or confidence.  (Cal. Rules of Court, rule 4.421(a)(2), (3), (11).)  While the fact that the victim was under 14 cannot constitute an aggravating factor in a section 288, subdivision (a) sentencing because it is an element of the offense (*People v. Ginese* (1981) 121 Cal.App.3d 468, 476), the victim's vulnerability can support the court's exercise of sentencing discretion in appropriate circumstances.  (*People v. Robinson* (1992) 11 Cal.App.4th 609, 615.)  Here, T.M.'s vulnerability was directly tied to her relationship with defendant.  That relationship bestowed a special trust upon defendant, not only by T.M. but by her entire family.  Defendant was entrusted as a protector, not an abuser, and he took advantage of that trust.  Defendant exploited that trust multiple times and, again, because of the familial relationship, his violations remained a secret for years, while T.M. struggled on a daily basis to understand what had happened.  Indeed, T.M. hid the abuse from her family for years because she knew the destruction it would, and ultimately did, wreak on the families.

Notwithstanding the evidence presented by defendant that he is not a danger to society, the court's sentencing decision is amply supported by the factors it noted.  On this record, we cannot say that the court abused its discretion in sentencing defendant to the upper term on count 1.  (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1371 ["One aggravating factor is sufficient to support the imposition of an upper term."].)

### 2.    **Defendant's Ex Post Facto *Apprendi* Claim**

Defendant contends that he is entitled to notice and a jury trial on the factors used to impose the upper term on count 1.  His argument hinges on the application of

27

section 1170, subdivision (b) as it existed in 2000, before it was amended to conform to *Apprendi v. New Jersey* (2000) 530 U.S. 466. That argument is foreclosed by *People v. Sandoval*, *supra*, 41 Cal.4th at p. 857.

## IV. DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Mihara, J.